(Slip Opinion)          OCTOBER  TERM,  2009                    1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is
being done in connection with this case, at the time the opinion is issued.
The syllabus constitutes no part of the opinion of the Court but has been
prepared by the Reporter of Decisions for the convenience of the reader.
See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## ALABAMA ET AL. *v.* NORTH CAROLINA

### ON EXCEPTIONS TO THE PRELIMINARY AND SECOND REPORTS OF THE SPECIAL MASTER

No. 132, Orig.   Argued January 11, 2010—Decided June 1, 2010

In 1986, Congress granted its consent to the Southeast Interstate Low-
Level Radioactive Waste Management Compact (Compact), which
was entered into by Alabama, Florida, Georgia, Mississippi, North
Carolina, South Carolina, Tennessee, and Virginia.  The Compact is
administered by a Commission, which was required, *inter alia,* to
"identif[y] a host State for the development of a [new] regional-
disposal facility," and to "seek to ensure that such facility is licensed
and ready to operate . . . no . . . later than 1991."  Art. 4(E)(6), 99
Stat. 1875.  The Commission designated North Carolina as a host
State in 1986, thereby obligating North Carolina to take "appropriate
steps to ensure that an application for a license to construct and op-
erate a [low-level radioactive waste storage facility] is filed with and
issued by the appropriate authority."  Art. 5(C), *id.,* at 1877.

  In 1988, North Carolina asked the Commission for assistance with
the costs of licensing and building a facility.  The Commission
adopted a resolution declaring it "appropriate and necessary" to pro-
vide financial assistance, and ultimately paid almost $80 million to
North Carolina from 1988 through 1997.  North Carolina also ex-
pended $34 million of its own funds.  Yet by the mid 1990s, North
Carolina was still many years—and many tens of millions of dol-
lars—away from obtaining a license.

  In 1997, the Commission notified North Carolina that absent a
plan for funding the remaining licensing steps, it would not disburse
additional funds to North Carolina.  North Carolina responded that it
could not continue without additional funding.  After the parties
failed to agree on a long-term financing plan, in December 1997 the
Commission ceased its financial assistance to North Carolina, and
North Carolina subsequently began an orderly shutdown of its pro-

ject.

In June 1999, Florida and Tennessee filed a complaint with the Commission seeking monetary sanctions against North Carolina. In July 1999, North Carolina exercised its right under Article 7(G) to withdraw from the Compact. In December 1999, the Commission concluded that North Carolina had failed to fulfill its obligations under the Compact and adopted a sanctions resolution demanding that the State repay approximately $80 million in addition to other monetary penalties. North Carolina did not comply.

In 2003, this Court granted Alabama, Florida, Tennessee, Virginia, and the Commission (Plaintiffs) leave to file a bill of complaint against North Carolina under this Court's original jurisdiction, U. S. Const., Art. II, §2, cl. 2; 28 U. S. C. §1251(a). The complaint sets forth claims of violation of Plaintiffs' rights under the Compact (Count I), breach of contract (Count II), unjust enrichment (Count III), promissory estoppel (Count IV), and money had and received (Count V), and requests monetary and other relief, including a declaration that North Carolina is subject to sanctions and that the Commission's sanctions resolution is valid and enforceable.

The Court assigned the case to a Special Master, who has conducted proceedings and has filed two reports. The Preliminary Report recommends denying without prejudice North Carolina's motion to dismiss the Commission's claims on sovereign immunity grounds; denying Plaintiffs' motion for summary judgment on Count I, which sought enforcement of the Commission's sanctions resolution; granting North Carolina's cross-motion to dismiss Count I and other portions of the complaint seeking such enforcement; and denying North Carolina's motion to dismiss the claims in Counts II–V. The Master's Second Report recommended denying Plaintiff's motion for summary judgment and granting North Carolina's motion for summary judgment on Count II; and denying North Carolina's motion for summary judgment on Plaintiffs' remaining claims in Counts III–V. The parties filed a total of nine exceptions to the Master's Reports.

*Held:*

1. Plaintiffs' seven exceptions are overruled. Pp. 7–21.

(a) The terms of the Compact do not authorize the Commission to impose monetary sanctions against North Carolina. The Court's conclusion is confirmed by a comparison of the Compact's terms with three other interstate compacts concerning low-level radioactive waste storage approved by Congress contemporaneously with the Compact, all of which expressly authorize their commissions to impose monetary sanctions against their party States. Pp. 7–9.

(b) Plaintiffs' exception that North Carolina could not avoid monetary sanctions by withdrawing from the Compact is moot, be-

cause the Compact does not permit the Commission to impose monetary sanctions in any event. The Court deems their exception that North Carolina forfeited its right to object to a monetary penalty by failing to participate at the sanctions hearing both abandoned and meritless. P. 10.

(c) Because the express terms of the Compact do not make the Commission the "sole arbiter" of disputes arising under the Compact, *Texas* v. *New Mexico*, 462 U. S. 554, 569–570, the Court is not bound by the Commission's conclusion that North Carolina breached its obligations under the Compact. Nor does the Court apply deferential administrative-law standards of review to the Commission's conclusion, but instead exercises its independent judgment as to both fact and law in executing its role as the "exclusive" arbiter of controversies between the States, 28 U. S. C. §1251(a). Pp. 10–12.

(d) North Carolina did not breach its contractual obligation to take "appropriate steps" toward the issuance of a license. Pp. 12–19.

(1) The Compact requires North Carolina to take only those licensing steps that are "appropriate." The parties' course of performance establishes that it was not appropriate for North Carolina to proceed with the very expensive licensing process without external-financial assistance. Nothing in the Compact's text or structure requires North Carolina to cover all licensing and building costs on its own. Plaintiffs' assertion that it was understood that the host State would bear the up-front licensing and construction costs, but recoup those costs through its regional monopoly on radioactive waste disposal, is not reflected in the Compact. Pp. 13–18.

(2) Plaintiffs' alternative argument that North Carolina repudiated its obligation to take appropriate steps when it announced it would take no further steps to obtain a license fails for the same reasons their breach theory fails. Pp. 18–19.

(e) North Carolina did not breach an implied duty of good faith and fair dealing when it withdrew from the Compact. The Compact by its terms imposes no limitation on North Carolina's right to exercise its statutory right under Article 7(G) to withdraw from the Compact. A comparison between the Compact and other contemporaneously enacted compacts confirms the absence of a good-faith limitation in the Compact. Pp. 19–21.

2. North Carolina's two exceptions are overruled. Pp. 21–26.

(a) It was reasonable for the Special Master to deny without prejudice North Carolina's motion for summary judgment on the merits of Plaintiffs' equitable claims in Counts III–V. The Special Master concluded that those claims require further briefing, argument, and, possibly, discovery. The Court approves of the Special Master's reasonable exercise of his discretion to manage the proceedings. Pp. 21–

22.

    (b) Under *Arizona* v. *California*, 460 U. S. 605, 614, the Commission's claims are not barred by sovereign immunity so long as the Commission asserts the same claims and seeks the same relief as the plaintiff States. Nothing in the Court's subsequent cases suggests that *Arizona* v. *California* has been implicitly overruled, and North Carolina does not ask the Court to overrule that decision. At least with respect to Counts I and II, the Commission's claims under those Compact-related Counts are wholly derivative of the plaintiff States' claims. The summary judgment disallowing the claims in Counts I and II on their merits renders the sovereign immunity question with regard to any *relief* the Commission alone might have on those claims moot. Counts III–V are on a different footing. The Special Master concluded that further factual and legal development was necessary to determine whether the Commission's claims under these Counts were identical to those of the plaintiff States. The Special Master's case-management decision was reasonable. Pp. 22–26.

Exceptions to Special Master's Reports overruled, and Master's recommendations adopted; North Carolina's motions to dismiss Count I and for summary judgment on Count II granted; Plaintiffs' motions for judgment on Counts I and II denied; and North Carolina's motions to dismiss the Commission's claims on sovereign immunity grounds and for summary judgment on Counts III–V denied without prejudice.

    SCALIA, J., delivered the opinion of the Court, in which STEVENS, GINSBURG, and ALITO, JJ., joined, in which ROBERTS, C. J., joined in all but Parts II–D and III–B, in which KENNEDY and SOTOMAYOR, JJ., joined in all but Part II–E, in which THOMAS, J., joined in all but Part III–B, and in which BREYER, J., joined in all but Parts II–C, II–D, and II–E. KENNEDY, J., filed an opinion concurring in part and concurring in the judgment, in which SOTOMAYOR, J., joined. ROBERTS, C. J., filed an opinion concurring in part and dissenting in part, in which THOMAS, J., joined. BREYER, J., filed an opinion concurring in part and dissenting in part, in which ROBERTS, C. J., joined.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

———————

No. 132, Orig.

———————

## STATE OF ALABAMA, STATE OF FLORIDA, STATE OF TENNESSEE, COMMONWEALTH OF VIRGINIA, AND SOUTHEAST INTERSTATE LOW-LEVEL RADIO-ACTIVE WASTE MANAGEMENT COMMISSION, PLAINTIFFS *v.* STATE OF NORTH CAROLINA

### ON EXCEPTIONS TO THE PRELIMINARY AND SECOND REPORTS OF THE SPECIAL MASTER

[June 1, 2010]

JUSTICE SCALIA delivered the opinion of the Court.

In this case, which arises under our original jurisdiction, U. S. Const., Art. III, §2, cl. 2; 28 U. S. C. §1251(a), we consider nine exceptions submitted by the parties to two reports filed by the Special Master.

I

In 1986, Congress granted its consent under the Compact Clause, U. S. Const., Art. I, §10, cl. 3, to seven interstate compacts providing for the creation of regional facilities to dispose of low-level radioactive waste. Omnibus Low-Level Radioactive Waste Interstate Compact Consent Act, 99 Stat. 1859. One of those compacts was the Southeast Interstate Low-Level Radioactive Waste Management Compact (Compact), entered into by Alabama, Florida, Georgia, Mississippi, North Carolina, South Carolina, Tennessee, and Virginia. *Id.,* at 1871–1880. That Compact established an "instrument and framework for a cooperative effort" to develop new facilities for the long-

term disposal of low-level radioactive waste generated within the region. Art. 1, *id.,* at 1872. The Compact was to be administered by a Southeast Interstate Low-Level Radioactive Waste Management Commission (Commission), composed of two voting members from each party State. Art. 4(A), *id.,* at 1874.

A pre-existing facility in Barnwell, South Carolina was to serve as the initial facility for regional generators to dispose of their low-level radioactive waste. Art. 2(10), *id.,* at 1873. That facility was scheduled to close as the regional-disposal facility for the Compact by the end of 1992, *ibid.,* and so the Compact required the Commission to develop "procedures and criteria for identifying . . . a host [S]tate for the development of a second regional disposal facility," and to "seek to ensure that such facility is licensed and ready to operate as soon as required but in no event later than 1991," Art. 4(E)(6), *id.,* at 1875. The Compact authorized the Commission to "designate" a party State as a host State for the facility. Art. 4(E)(7), *ibid.*

In September 1986, the Commission designated North Carolina as the host for the second facility. North Carolina therefore became obligated to "take appropriate steps to ensure that an application for a license to construct and operate a [low-level radioactive waste storage facility] is filed with and issued by the appropriate authority." Art. 5(C), *id.,* at 1877. In 1987, North Carolina's General Assembly created the North Carolina Low-Level Radioactive Waste Management Authority (Authority) to fulfill the State's obligation. N. C. Gen. Stat. §104G (1987), 1987 N. C. Sess. Laws ch. 850.

Although "[t]he Commission is not responsible for any costs associated with," among other things, "the creation of any facility," Art. 4(K)(1), 99 Stat. 1876, North Carolina asked the Commission for financial assistance with building and licensing costs. The Commission responded by

adopting a resolution, which declared it was both "appropriate and necessary" for the Commission "to provide financial assistance" to North Carolina. App. 63. To that end, the Commission created a "Host States Assistance Fund" to help North Carolina with the "financial costs and burdens" of "preliminary planning, the administrative preparation, and other pre-operational" activities. *Id.,* at 64.

The estimate in 1989 was that it would cost approximately $21 million and take two years to obtain a license for North Carolina's regional-disposal facility. That proved to be wildly optimistic. By 1990, the cost estimate had ballooned to $45.8 million, and the estimated date for obtaining a license now extended far into 1993. At the beginning of 1994 there still was no license, and the estimated cost had grown to $87.1 million. By end of 1994 the estimate was $112.5 million, and issuance of a license was not anticipated until 1997. And by December 1996 the estimated cost had increased by another $27 million and the projected date to receive a license had become August 2000.

North Carolina's own appropriations—approximately $27 million from Fiscal Year 1988 through Fiscal Year (FY) 1995—did not cover the costs of the licensing phase. But during the same time period, the Commission provided North Carolina with approximately $67 million. The funds came from surcharges and access fees collected for that purpose from generators disposing of low-level radioactive waste at the pre-existing Barnwell facility. *Id.,* at 71–74, 145.

In July 1995, however, South Carolina withdrew from the Compact, thereby depriving the Commission of continued revenues from the Barnwell facility. In 1996, the Commission accordingly informed North Carolina that it would no longer be able to provide financial support for licensing activities. The Governor of North Carolina

responded that the State was not prepared to assume a greater portion of the project's costs, and would not be able to proceed without continued Commission funding. Shortly thereafter the Commission adopted a resolution declaring that it was willing and able to provide additional funds, but calling on North Carolina to work with it to develop long-term funding sources for the facility. From FY 1996 through FY 1998, the Commission provided North Carolina approximately an additional $12.27 million in financial assistance. North Carolina, for its part, continued to provide its own funds toward licensing activities—another $6 million during the same time period.

In August 1997, the Commission notified North Carolina that absent a plan for funding the remaining steps of the licensing phase, it would not disburse additional funds to North Carolina after November 30, 1997. North Carolina responded that it would not be able to continue without additional guarantees of external funding. On December 1, 1997, the parties having failed to agree upon a long-term financing plan, the Commission ceased financial assistance to North Carolina. By then it had provided almost $80 million.

On December 19, 1997, North Carolina informed the Commission it would commence an orderly shutdown of its licensing project, and since that date has taken no further steps toward obtaining a license for the facility. But it did continue to fund the Authority for several more years, in the hope that the project would resume upon the restoration of external financial assistance. North Carolina maintained the proposed facility site, preserved the work it had completed to date, and retained the Authority's books and records. It also participated in discussions with the Commission, generators of low-level radioactive waste, and other stakeholders regarding options to resolve the financing shortfall. From FY 1988 through FY 2000, North Carolina had expended almost $34 million toward

obtaining a license.

In June 1999, after attempts to resolve the funding impasse had failed, Florida and Tennessee filed with the Commission a complaint for sanctions against North Carolina. It alleged that North Carolina had failed to fulfill its obligations under the Compact, and requested (among other things) return of the almost $80 million paid to North Carolina by the Commission, plus interest, as well as damages and attorney's fees. The next month, North Carolina withdrew from the Compact by enacting a law repealing its status as a party State, see 1999 N. C. Sess. Laws ch. 357, as required by Article 7(G) of the Compact.

More than four months later, in December 1999, the Commission held a sanctions hearing. North Carolina did not participate. After the hearing, the Commission concluded that North Carolina had failed to fulfill its obligations under the Compact. It adopted a resolution demanding that North Carolina repay approximately $80 million, plus interest, to the Commission; pay an additional $10 million penalty to compensate the Commission for the loss of future revenue (surcharges and access fees) it would have received had a facility been completed in North Carolina; and pay the Commission's attorney's fees. North Carolina did not comply.

In July 2000, seeking to enforce its sanctions resolution, the Commission moved for leave to file a bill of complaint under our original jurisdiction. *Southeast Interstate Low-Level Radioactive Waste Management Commission* v. *North Carolina*, No. 131, Orig. North Carolina opposed the motion on the grounds that the Commission could not invoke this Court's original jurisdiction, and we invited the Solicitor General to express the views of the United States. 531 U. S. 942 (2000). The Solicitor General filed a brief urging denial of the Commission's motion on the grounds that the Commission's bill of complaint did not

fall within our exclusive original jurisdiction over "controversies between two or more States." §1251(a). We denied the Commission's motion. 533 U. S. 926 (2001).

In June 2002, the States of Alabama, Florida, Tennessee, and Virginia, joined by the Commission (collectively Plaintiffs), moved for leave to file a bill of complaint against North Carolina. North Carolina opposed the motion, and we again sought the views of the Solicitor General. 537 U. S. 806 (2002). The United States urged that we grant Plaintiffs' motion, which we did. 539 U. S. 925 (2003). The bill of complaint contains five counts: violation of the party States' rights under the Compact (Count I); breach of contract (Count II); unjust enrichment (Count III), promissory estoppel (Count IV); and money had and received (Count V). Plaintiffs' prayer for relief requests a declaration that North Carolina is subject to sanctions and that the Commission's sanctions resolution is valid and enforceable, as well as the award of damages, costs, and other relief.

We assigned the case to a Special Master, 540 U. S. 1014 (2003), who has conducted proceedings and now has filed two reports. The Master's Preliminary Report addressed three motions filed by the parties. He recommended denying without prejudice North Carolina's motion to dismiss the Commission's claims against North Carolina on the grounds of sovereign immunity. Preliminary Report 4–14. He recommended denying Plaintiffs' motion for summary judgment on Count I, which sought enforcement of the Commission's sanctions resolution. *Id.,* at 14–33. He recommended granting North Carolina's cross-motion to dismiss Count I and other portions of the bill of complaint that sought enforcement of the sanctions resolution. *Id.,* at 33–34. And he recommended denying North Carolina's motion to dismiss the claims in Counts II–V. *Id.,* at 34–43.

After the Special Master issued his Preliminary Report,

the parties engaged in partial discovery and subsequently filed cross-motions for summary judgment. The Special Master's Second Report recommended denying Plaintiffs' motion for summary judgment on Count II, Second Report 8–35, and granting North Carolina's motion for summary judgment on Count II, *id.,* at 35–40. Finally, he recommended denying North Carolina's motion for summary judgment on Plaintiffs' remaining claims in Counts III–V. *Id.,* at 41–45.

## II

Plaintiffs present a total of seven exceptions to the Special Master's two reports. We address them in turn.

## A

Their first exception challenges the Special Master's conclusion that the Commission lacked authority to impose monetary sanctions upon North Carolina. The terms of the Compact determine that question.

Article 4(E) of the Compact sets forth the Commission's "duties and powers." Among its powers are the authority "[t]o revoke the membership of a party [S]tate that willfully creates barriers to the siting of a needed regional facility," Art. 4(E)(7), 99 Stat. 1875, and the authority "[t]o revoke the membership of a party [S]tate in accordance with Article 7(f)," Art. 4(E)(11), *ibid.* Conspicuously absent from Article 4, however, is any mention of the authority to impose monetary sanctions. Plaintiffs contend that authority may be found elsewhere—in the first paragraph of Article 7(F), which provides in relevant part:

> "Any party [S]tate which fails to comply with the provisions of this compact or to fulfill the obligations incurred by becoming a party [S]tate to this compact may be subject to sanctions by the Commission, including suspension of its rights under this compact and revocation of its status as a party [S]tate." *Id.,* at

1879.

The sanctions expressly identified in Article 7(F)—
"suspension" of rights and "revocation" of party-state
status—flow directly from the Commission's power in
Articles 4(E)(7) and (11) to revoke a party State's member-
ship. That can fairly be understood to include the lesser
power to suspend a party State's rights. There is no simi-
lar grounding in Article 4(E) of authority to impose mone-
tary sanctions, and the absence is significant.

According to Plaintiffs, however, the word "sanctions" in
Article 7(F) naturally "includ[es]" monetary sanctions.
Since the Compact contains no definition of "sanctions,"
we give the word its ordinary meaning. A "sanction" (in
the sense the word is used here) is "[t]he detriment loss of
reward, or other coercive intervention, annexed to a viola-
tion of a law as a means of enforcing the law." Webster's
New International Dictionary 2211 (2d ed. 1957) (herein-
after Webster's Second); see Black's Law Dictionary 1458
(9th ed. 2009) ("A penalty or coercive measure that results
from failure to comply with a law, rule, or order"). A
monetary penalty is assuredly one kind of "sanction." See
generally *Department of Energy* v. *Ohio*, 503 U. S. 607,
621 (1992). But there are many others, ranging from the
withholding of benefits, or the imposition of a nonmone-
tary obligation, to capital punishment. The Compact
surely does not authorize the Commission to impose all of
them.

Ultimately, context dictates precisely which "sanctions"
are authorized under Article 7(F), and nothing in the
Compact suggests that these include monetary measures.
The only two "sanctions" specifically identified as being
included within Article 7(F) are "suspension" of a State's
rights under the Compact and "revocation" of its status as
a party State. These are arguably merely examples, and
may not exhaust the universe of sanctions the Commission

can impose. But they do establish "illustrative applica-tion[s] of the general principle," *Federal Land Bank of St. Paul* v. *Bismarck Lumber Co.*, 314 U. S. 95, 100 (1941), which underlies the kinds of sanctions the Commission can impose. It is significant that both these specifically authorized sanctions are prospective and nonmonetary in nature.

Moreover, Article 3 of the Compact provides: "The rights granted to the party [S]tates by this compact are addi-tional to the rights enjoyed by sovereign states, and noth-ing in this compact shall be construed to infringe upon, limit, or abridge those rights." 99 Stat. 1873. Construing Article 7(F) to authorize monetary sanctions would violate this provision, since the primeval sovereign right is im-munity from levies against the government fisc. See, *e.g., Alden* v. *Maine*, 527 U. S. 706, 750–751 (1999).

Finally, a comparison of the Compact's terms with those of "[o]ther interstate compacts, approved by Congress contemporaneously," *Texas* v. *New Mexico*, 462 U. S. 554, 565 (1983), confirms that Article 7(F) does not authorize monetary sanctions. At the same time Congress consented to this Compact, it consented to three other interstate compacts that expressly authorize their commissions to impose monetary sanctions against the parties to the compacts. See Northeast Interstate Low-Level Radioac-tive Waste Management Compact, Art. IV(i)(14), 99 Stat. 1915 (hereinafter Northeast Compact); Central Midwest Interstate Low-Level Radioactive Waste Compact, Art. VIII(f), 99 Stat. 1891 (hereinafter Central Midwest Com-pact); Central Interstate Low-Level Radioactive Waste Compact, Art. VII(e), 99 Stat. 1870 (hereinafter Central Compact). The Compact "clearly lacks the features of these other compacts, and we are not free to rewrite it" to empower the Commission to impose monetary sanctions. *Texas* v. *New Mexico*, 462 U. S., at 565.

B

Because the Compact does not authorize the Commission to impose monetary sanctions, Plaintiffs' second exception—that North Carolina could not avoid monetary sanctions by withdrawing from the Compact—is moot. The third exception also pertains to the Commission's sanctions resolution: that North Carolina forfeited its right to object to a monetary penalty by failing to participate at the sanctions hearing. Plaintiffs have failed to argue this exception. They have merely noted that North Carolina refused to participate at the sanctions hearing, and have cited no law in support of the proposition that this was a forfeit. We deem the exception abandoned. It was wisely abandoned, because it is meritless. North Carolina opposed the sanctions resolution and denied that the Commission had jurisdiction to impose sanctions against it.

C

Plaintiffs next take exception to the Special Master's recommendation that no binding effect or even deference be accorded to the Commission's conclusion that North Carolina violated Article 5(C) of the Compact. We are bound by the Commission's conclusion of breach only if there is "an explicit provision or other clear indicatio[n]" in the Compact making the Commission the "sole arbiter of disputes" regarding a party State's compliance with the Compact. *Id.,* at 569–570. Plaintiffs assert there is such a provision, the second sentence of Article 7(C), which states: "The Commission is the judge of the qualifications of the party [S]tates and of its members and of their compliance with the conditions and requirements of this compact and the laws of the party [S]tates relating to the enactment of this compact." 99 Stat. 1879.

Plaintiffs greatly overread this provision. The limited nature of the authority to "judge" that it confers upon the

Commission is clear from its context. The first sentence of Article 7(C) states that an eligible State "shall be de-clared" a party State "upon enactment of this compact into law by the [S]tate and upon [the] payment of" a $25,000 fee, as "required by Article 4(H)(1)." *Ibid.* The second sentence makes the Commission the "judge" of four mat-ters, *all of which concern status as a party State or Com-mission member.* First, the Commission is the judge of the "qualifications" of a State to become a party State (the qualifications set forth in Article 7(A) for the initial party States and in Article 7(B) for States that subsequently petition to join). Second, the Commission is the judge of the qualifications of the members of the Commission, which are specified in Article 4(A). Third, the Commission is the judge of a party State's compliance with the "condi-tions" and "requirements" of the Compact. The former term is an obvious reference to Article 7(B): "The Commis-sion may establish such conditions as it deems necessary and appropriate to be met by a [S]tate wishing . . . to become a party [S]tate to this [C]ompact." *Id.,* at 1878. The accompanying term "requirements" also refers to Article 7's prescriptions for prospective party States, such as paying the "fees required" under Article 7(C), *id.,* at 1879, and obtaining, as Article 7(B) requires, a two-thirds vote of the Commission in favor of admission. Finally, the Commission is the judge of the "laws of the party [S]tates relating to the enactment of this compact." Art. 7(C), *ibid.* Again, that concerns status as a party State, which re-quires that the State "enac[t] . . . this compact into law," *ibid.* The Commission is the "judge" of only these specific matters.

This is not to say the Commission lacks authority to interpret the Compact or to say whether a party State has violated its terms. That is of course implicit in its power to sanction under Article 7(F). But because "the express terms of the [Southeast] Compact do not constitute the

Commission as the sole arbiter" regarding North Carolina's compliance with its obligations under the Compact, *Texas* v. *New Mexico*, 462 U. S., at 569, we are not bound to follow the Commission's findings.

Plaintiffs argue that we nonetheless owe deference to the Commission's conclusion. But unless the text of an interstate compact directs otherwise, we do not review the actions of a compact commission "on the deferential model of judicial review of administrative action by a federal agency." *Id.,* at 566–567. The terms of this Compact do not establish that "this suit may be maintained only as one for judicial review of the Commission's" determination of breach. *Id.,* at 567. Accordingly, we do not apply administrative-law standards of review, but exercise our independent judgment as to both fact and law in executing our role as the "exclusive" arbiter of controversies between the States, §1251(a).

D

Plaintiffs' next two exceptions are to the Special Master's recommendations to deny their motion for summary judgment on their breach-of-contract claims, and to grant North Carolina's motion for summary judgment on those claims. In resolving motions for summary judgment in cases within our original jurisdiction, we are not technically bound by the Federal Rules of Civil Procedure, but we use Rule 56 as a guide. This Court's Rule 17.2; *Nebraska* v. *Wyoming*, 507 U. S. 584, 590 (1993). Hence, summary judgment is appropriate where there "is no genuine issue as to any material fact" and the moving party is "entitled to a judgment as a matter of law." Fed. Rule Civ. Proc. 56(c); see *Celotex Corp.* v. *Catrett*, 477 U. S. 317, 322 (1986); *Anderson* v. *Liberty Lobby, Inc.*, 477 U. S. 242, 248 (1986).

1

Plaintiffs claim North Carolina breached the Compact in December 1997, when (as it admits) it ceased all efforts toward obtaining a license. At that point, in their view, North Carolina was no longer "tak[ing] appropriate steps to ensure that an application for a license to construct and operate a [low-level radioactive waste storage facility] is filed with and issued by the appropriate authority," Art. 5(C), 99 Stat. 1877. North Carolina says that once the Commission ceased providing financial assistance on December 1, and once it became clear there was insufficient funding to complete the licensing phase, there were no more "appropriate" steps to take. The Special Master concluded that the phrase "appropriate steps" in Article 5(C) was ambiguous, and that the parties' course of performance established that North Carolina was not required to take steps toward obtaining a license once it was made to bear the remaining financial burden of the licensing phase. Second Report 10–24, 35–36. Plaintiffs take exception to that conclusion.

Article 5(C) does not require North Carolina to take any and all steps to license a regional-disposal facility; only those that are "appropriate." Plaintiffs contend that this requires North Carolina to take the steps set forth in the regulations of the Nuclear Regulatory Commission governing the filing and disposition of applications for licenses to operate radioactive waste disposal facilities, 10 CFR pt. 61 (1997). Those regulations set forth some, but certainly not all, of the "steps" the State would have to take to obtain a license. But Article 5(C) does not incorporate the regulations by reference, much less describe them as the *appropriate* steps.

We could accept Plaintiffs' contention if "appropriate" meant "necessary" (the steps set forth in the regulation are assuredly necessary to obtaining a license). But it does not. Whether a *particular* step is "appropriate"—

"[s]pecially suitable; fit; proper," Webster's Second 133—
could depend upon many factors other than its mere in-
dispensability to obtaining a license. It would not be
appropriate, for example, to take a step whose cost greatly
exceeded whatever benefits the license would confer, or if
it was highly uncertain the license would ever issue.

In determining whether, in terminating its efforts to
obtain a license, North Carolina failed to take what the
parties considered "appropriate" steps, the parties' course
of performance under the Compact is highly significant.
See, *e.g., New Jersey* v. *New York*, 523 U. S. 767, 830–831
(1998) (SCALIA, J., dissenting); Restatement (Second) of
Contracts §§202(4), 203 (1979) (hereinafter Restatement).
That firmly establishes that North Carolina was not ex-
pected to go it alone—to proceed with the very expensive
licensing process without any external financial assis-
tance. The history of the Compact consists entirely of
shared financial burdens. From the beginning, North
Carolina made clear that it required financial assistance
to do the extensive work required for obtaining a license.
The Commission promptly declared it was "appropriate
and necessary" to assist North Carolina with the costs.
App. 63. It provided the vast majority of funding for li-
censing-related activities—$80 million, compared to North
Carolina's $34 million. The Commission repeatedly noted
the necessity (and propriety) of providing financial assis-
tance to North Carolina, and reiterated its dedication to
sharing the substantial financial burdens of the licensing
phase. See, *e.g., id.,* at 63, 71, 145. There is nothing to
support the proposition that the other States had an obli-
gation under the Compact to share the licensing costs
through the Commission; but we doubt that they did so
out of love for the Tarheel State. They did it, we think,
because that was their understanding of how the Compact
was supposed to work. One must take the Commission at
its word, that it was "appropriate" to share the cost—

which suggests that it would not have been appropriate to make North Carolina proceed on its own.

Nor was North Carolina required after December 19, 1997, to continue to expend its own funds at the same level it had previously (which Plaintiffs concede had satisfied North Carolina's obligation to take "appropriate steps"). Once the Commission refused to provide any further financial assistance, North Carolina would have had to assume an unlimited financial commitment to cover all remaining licensing costs. Even if it maintained its prior rate of appropriations going forward, it would not have come close to covering the at least $34 million needed for the last steps of the licensing phase. And since the income from the South Carolina facility had been terminated, there was no apparent prospect of funding for the construction phase (expected to cost at least $75 million). In connection with its August 1997 refusal to provide further assistance, the Commission itself had said, "[I]t will be imprudent to continue to deplete Commission resources for this purpose if a source of funds is not established soon for the ultimate completion of the project." *Id.,* at 306, 307; Joint Supp. Fact Brief App. 36, 37. And in March 1998, the Commission "strongly" reiterated that "it would be imprudent to spend additional funds for licensing activities if funds will not be available to complete the project." *Id.,* at 59. What was imprudent for the Commission would surely have been imprudent (and hence inappropriate) for North Carolina as well. The State would have wasted millions of its taxpayers' dollars on what seemed to be a futile effort.

JUSTICE BREYER would uphold Plaintiffs' challenge on this point. He believes that the Compact obligated North Carolina to fund and complete the licensing and construction of a nuclear waste facility. *Post*, at 2, 4–6 (opinion concurring in part and dissenting in part). In fact, however, North Carolina was not even contractually required

to "secur[e] a license," *post*, at 2, but only to take "appropriate steps" to obtain one, Art. 5(C), 99 Stat. 1877.  And nothing in the terms of the Compact required North Carolina either to provide "adequate funding" for or to "beg[i]n construction" on a regional facility, *post*, at 2.  Other contemporaneously enacted interstate compacts expressly provide that the host State is "responsible for the timely development" of a regional facility, Central Midwest Compact, Art. VI(f), 99 Stat. 1887; Midwest Compact, Art. VI(e), *id.,* at 1898, or "shall . . . [c]ause a regional facility to be developed on a timely basis," Rocky Mountain Low-Level Radioactive Waste Compact, Art. III(d)(i), *id.,* at 1903–1904.  But the compact here before us has no such provision, and the contrast is telling.[1]  *Texas* v. *New Mexico*, 462 U. S., at 565.  Moreover, the Commission's statements described in the preceding paragraph, that it would be imprudent to commit additional resources "'if a source of funds is not established soon for the ultimate completion of the project,'" or "'if funds will not be available to complete the project,'" surely suggest that North Carolina is not committed to the funding by contract.

JUSTICE BREYER asserts, *post*, at 4–5, that the rotating-

───────────

[1] The Compact provides only that the host State is "responsible for the availability . . . of their regional facilities in accordance with" Article 5(B).  Art. 3(C), 99 Stat. 1873–1874.  The latter section makes clear that responsibility for "availability" does not mean that the host State will fund construction of the facility, but that it will keep it open and not impose unreasonable restrictions on its use.  JUSTICE BREYER is correct that the Compact says the Commission is not "responsible" for the costs of "the creation" of a regional facility.  Art. 4(K)(1), *id.,* at 1876.  But what is important here is that it does *not* say that the host State *is* responsible—which (if it were true) would almost certainly have been joined with saying who was not responsible.  What JUSTICE BREYER overlooks is the possibility that *no one* is responsible, and the licensing and construction of the facility is meant to depend upon *voluntary* funding by interested parties, such as the party States, the Commission, and low-level radioactive waste generators.

host requirement in the Compact, see Art. 5(A), 99 Stat. 1873, necessarily implies that North Carolina is solely responsible for the licensing and construction costs of its facility. But all that requirement entails is that a party State "shall not be designated" as a host State for a second time before "each [other] party [S]tate" has taken a turn. *Ibid.* It can perfectly well envision that the States will take turns in bearing the lead responsibility for getting the facility licensed, supervising its construction, and operating the facility on its soil. In fact, that is just what its text suggests, since it describes the responsibility that is to be rotated as the host State's "obligation . . . to have a regional facility operated within its borders." *Ibid.* Not to construct it, or pay for its construction, but to "have [it] operated within its borders." As noted above, other con-temporaneously enacted compacts do spell out the obliga-tion of the host State to construct the facility. Still others at least provide that the host State will recoup its costs through disposal fees—which arguably suggests that the host State is to bear the costs. See, *e.g.,* Central Compact, Art. III(d), 99 Stat. 1865; Northeast Compact, Art. III(c)(2), *id.,* at 1913. The compact before us here does not even contain that arguable suggestion.

What it comes down to, then, is JUSTICE BREYER's intui-tion that the whole *point* of the Compact was that each designated host State would bear the up-front costs of licensing and construction, but would eventually recoup those costs through its regional monopoly on the disposal of low-level radioactive waste. *Post*, at 5–6. He can cite no provision in the Compact which reflects such an under-standing, and the behavior of the parties contradicts it.[2] It

——————
[2] The course-of-dealing evidence that JUSTICE BREYER identifies, *post*, at 6–7, is not probative. The Commission's statements that it is not legally responsible for costs and that at some point Commission funds will no longer be available, and North Carolina's assurances that it will keep its commitments and honor its obligations, are perfectly compati-

would, moreover, have been a foolish understanding, since the regional monopoly to recoup construction costs would not be a monopoly if South Carolina withdrew and continued to operate its facility—which is exactly what happened in 1995.[3]  Even leaving aside the principle, discussed *infra*, at 21, that implied obligations are not to be read into interstate compacts, JUSTICE BREYER's intuition fails to reflect the reality of what was implied.

2

Plaintiffs take exception to the Special Master's rejection of their alternative argument that North Carolina repudiated the Compact when it announced it would not take further steps toward obtaining a license.  They argue that North Carolina's announcement that it was shutting down the project constituted a refusal to tender any further performance under the contract.

Plaintiffs' repudiation theory fails for the same reasons their breach theory fails.  A repudiation occurs when an obligor either informs an obligee "that the obligor will

_____

ble with the proposition that North Carolina did not have to provide *all* funding for licensing the facility, and that it would be "inappropriate" to proceed toward obtaining a license for a facility that would never be needed or built.

[3] South Carolina's withdrawal from the Compact not only "*could*" affect North Carolina's ability to recoup its facility costs, as JUSTICE BREYER grudgingly concedes, *post*, at 5; it unquestionably *would*.  With a regional competitor in the Barnwell facility and declining demand for waste disposal facilities due to technological and other factors, App. 261, 263–264, North Carolina would receive significantly lower revenues from its facility, *id.,* at 261–262, 265.  The document attached to a 1996 letter from North Carolina to the Commission trumpeting "$600 million in cost savings" that would come from a new facility, *post*, at 5, proves precisely the opposite of what JUSTICE BREYER thinks.  The cost savings were to accrue "to all *generators*" of waste, App. 266 (emphasis added)—that is, those who would use North Carolina's facility.  Those savings would come, of course, from lower costs for waste disposal, which means that North Carolina would be charging *lower* rates than the Barnwell facility (and thus receiving *lower* revenues).

commit a breach that would of itself give the obligee a claim for damages for total breach," Restatement §250(a), or performs "a voluntary affirmative act which renders the obligor unable or apparently unable to perform without such a breach," *id.,* §250(b). Neither event occurred here. North Carolina never informed the Commission (or any party State) that it would not fulfill its Article 5(C) obligation to take appropriate steps toward obtaining a license. Rather, it refused to take further steps that were not appropriate. Nor did North Carolina take an affirmative act that rendered it unable to perform. To the contrary, it continued to fund the Authority for almost two years; it maintained the records of the Authority; and it preserved the work completed to date while waiting for alternative funding sources that would enable resumption of the project. Plaintiffs further argue that a repudiation was effected by North Carolina's refusal to take further steps toward licensing "except on conditions which go beyond" the terms of the Compact, Restatement §250, Comment *b* (internal quotation marks omitted)—*i.e.*, the provision of external-financial assistance. But, as we have discussed, external-financial assistance was contemplated by the Compact.

E

Plaintiffs' final exception is to the Special Master's recommendation to deny their motion for summary judgment, and to grant North Carolina's cross-motion for summary judgment, on their claim that North Carolina violated the implied duty of good faith and fair dealing when it withdrew from the Compact in July 1999. Plaintiffs concede that North Carolina could withdraw from the Compact, but contend it could not do so in "bad faith." And, they assert, its withdrawal after accepting $80 million from the Commission, and with monetary sanctions pending against it, was the epitome of bad faith.

We have never held that an interstate compact approved by Congress includes an implied duty of good faith and fair dealing. Of course "[e]very contract imposes upon each party a duty of good faith and fair dealing in its performance and enforcement." Restatement §205. But an interstate compact is not just a contract; it is a federal statute enacted by Congress. If courts were authorized to add a fairness requirement to the implementation of federal statutes, judges would be potent lawmakers indeed. We do not—we cannot—add provisions to a federal statute. See, *e.g., Connecticut Nat. Bank* v. *Germain*, 503 U. S. 249, 254 (1992). And in that regard a statute which is a valid interstate compact is no different. *Texas* v. *New Mexico*, 462 U. S., at 564, 565. We are especially reluctant to read absent terms into an interstate compact given the federalism and separation-of-powers concerns that would arise were we to rewrite an agreement among sovereign States, to which the political branches consented. As we have said before, we will not "'order relief inconsistent with [the] express terms'" of a compact, "no matter what the equities of the circumstances might otherwise invite." *New Jersey* v. *New York*, 523 U. S., at 811 (quoting *Texas* v. *New Mexico*, *supra*, at 564).

The Compact imposes no limitation on North Carolina's exercise of its statutory right to withdraw. Under Article 7(G), which governed North Carolina's withdrawal,[4] "any party [S]tate may withdraw from the compact by enacting a law repealing the compact." 99 Stat. 1879. There is no restriction upon a party State's enactment of such a law,

———————

[4] After North Carolina was designated as a host State, the Compact was amended to add Article 7(H), which restricted the ability of a party State to withdraw to within 30 days after a second regional-disposal facility opened. Southeast Interstate Low-Level Radioactive Waste Compact Amendments Consent Act of 1989, Pub. L. 101–171, §2, 103 Stat. 1289. That provision did not apply when North Carolina withdrew, because its facility had not been opened.

and nothing in the Compact suggests the parties understood there were "certain purposes for which the expressly conferred power . . . could not be employed." *Tymshare, Inc.* v. *Covell*, 727 F. 2d 1145, 1153 (CADC 1984) (opinion for the court by Scalia, J.).  Moreover, Article 3 ensures that no such restrictions may be implied, since it provides that the Compact shall not be "construed to infringe upon, limit or abridge" the sovereign rights of a party State.

A comparison of the Compact with other, contemporaneously enacted, compacts confirms there is no such limitation on North Carolina's right to withdraw.  See *Texas* v. *New Mexico*, *supra*, at 565.  In contrast to the Compact, several other compacts concerning the creation of regional facilities for the disposal of low-level radioactive waste contain express good-faith limitations upon a State's exercise of its rights.  See, *e.g.,* Central Compact, Art. III(f), 99 Stat. 1865; Central Midwest Compact, Art. V(a), *id.,* at 1886; Midwest Interstate Low-Level Radioactive Waste Management Compact, Art. V(a), *id.,* at 1897.

## III

North Carolina submits two exceptions—one to the Special Master's Second Report and one to his Preliminary Report.

## A

North Carolina takes exception to the recommendation of the Second Report to deny without prejudice its motion for summary judgment on the merits of Plaintiffs' equitable claims in Counts III–V.  North Carolina's motion was based on the ground that, as a matter of law, its obligations are governed entirely by the Compact.  The Special Master recommended denying the motion without prejudice, because the claims in Counts III–V "requir[e] further briefing and argument, and possibly further discovery."

Second Report 41.  A threshold question for all claims in those Counts, for example, is whether they "belong to the Commission, the Plaintiff States, or both." *Ibid.*  Perhaps the States can bring them in their capacity as *parens patriae*, but as the Special Master noted "the parties have not adequately briefed this issue, and its resolution in this case is unclear." *Id.,* at 42–43.

We think it was reasonable for the Special Master to defer ruling.  We granted the Special Master discretion to "direct subsequent proceedings" and "to submit such reports as he may deem appropriate."  540 U. S., at 1014. He could have deferred filing any report until full factual discovery had been completed and all of the legal issues, many of which are novel and challenging, had been fully briefed, considered, and decided.  Instead, he concluded that our immediate resolution of Counts I and II would facilitate the efficient disposition of the case; and in agreeing to hear exceptions to his Preliminary Report and Second Report we implicitly agreed.  His deferral of ruling on the merits of Counts III–V is part and parcel of the same case management, and we find no reason to upset it.

B

North Carolina takes exception to the Special Master's recommendation in his Preliminary Report to deny without prejudice its motion to dismiss the Commission's claims on the ground that they are barred by the Eleventh Amendment to the Constitution and by structural principles of state sovereign immunity.  The Special Master assumed for the sake of argument that a State possesses sovereign immunity against a claim brought by an entity, like the Commission, created by an interstate compact,[5]

--------

[5]We have held that an entity created through a valid exercise of the Interstate Compact Clause is not entitled to immunity from suit under the Eleventh Amendment, see *Hess* v. *Port Authority Trans-Hudson Corporation*, 513 U. S. 30 (1994), but we have not decided whether such

Preliminary Report 5. But he recommended denying North Carolina's motion to dismiss "at this point in the proceedings." *Ibid.*

The Special Master relied upon our decision in *Arizona* v. *California*, 460 U. S. 605 (1983), which held that the Eleventh Amendment did not bar the participation of several Indian Tribes in an original action concerning the allocation of rights to the waters of the Colorado River. The United States had already intervened, in its capacity as trustee for several Indian Tribes; but the Tribes moved to intervene as well, and the States opposed. We granted the Tribes' motion, stating that the States do not enjoy sovereign immunity against the United States, and "[t]he Tribes do not seek to bring new claims or issues against the States, but only ask leave to participate in an adjudication of their vital water rights that was commenced by the United States." *Id.,* at 614. Thus, "our judicial power over the controversy is not enlarged by granting leave to intervene, and the States' sovereign immunity protected by the Eleventh Amendment is not compromised." *Ibid.* Relying on this holding, the Special Master held that sovereign immunity does not bar the Commission's suit, so long as the Commission asserts the same claims and seeks the same relief as the other plaintiffs. Whether that is so, he said, "cannot be resolved without further factual and legal development[s]," Preliminary Report 6, and so North Carolina is free to renew its motion at a later point, *id.,* at 13–14. See Second Report 45–48.

Assuming (as the Special Master did) that the Commission's claims against North Carolina implicate sovereign immunity, we agree with his disposition. North Carolina contends that making application of the Constitution's waiver of sovereign immunity turn upon whether a nonsovereign party seeks to expand the relief sought is

---

an entity's suit *against* a State is barred by sovereign immunity.

inconsistent with our decisions construing state sovereign immunity as a "personal privilege." *College Savings Bank* v. *Florida Prepaid Postsecondary Ed. Expense Bd.*, 527 U. S. 666, 675 (1999) (internal quotation marks omitted); see also *Alden*, 527 U. S., at 758. But nothing in those cases suggests that *Arizona* v. *California* has been implicitly overruled.[6] See *Shalala* v. *Illinois Council on Long Term Care, Inc.*, 529 U. S. 1, 18 (2000). Neither of them arose under our original jurisdiction, and neither cited *Arizona* v. *California* or discussed—at all—the sovereign immunity issue that case addressed. That sovereign immunity is a personal privilege of the States says nothing about whether that privilege "is not compromised," *Arizona* v. *California, supra,* at 614, by an additional, nonsovereign plaintiff's bringing an entirely overlapping claim for relief that burdens the State with no additional defense or liability.[7]

North Carolina contends that *Arizona* v. *California* cannot apply to the Commission's claims, because the Commission does not—indeed, cannot—assert the same claims or seek the same relief as the plaintiff States. We disagree. In the bill of complaint, the States and the Commission assert the same claims and request the same relief. Bill of Complaint ¶¶62–86 and Prayer for Relief. Their claim for restitution of $80 million cannot, given the

—————

[6] North Carolina has not asked us to overrule *Arizona* v. *California*, 460 U. S. 605 (1983). We decline to do so on our own motion and without argument. We therefore do not address the merits of THE CHIEF JUSTICE's dissent.

[7] North Carolina also asserts that our decisions in *Pennhurst State School and Hospital* v. *Halderman*, 465 U. S. 89 (1984), and *County of Oneida* v. *Oneida Indian Nation of N. Y.*, 470 U. S. 226 (1985), undermine *Arizona* v. *California, supra,* at 614. They do not. In neither case were there entirely overlapping claims for relief between sovereign and nonsovereign plaintiffs. See *Pennhurst, supra,* at 103, n. 12. Indeed, in *County of Oneida* there was no sovereign plaintiff.

other allegations of the complaint, be thought to be $80 million payable to each of the four plaintiff States and the Commission.

North Carolina argues, however, that summary judgment in its favor is appropriate because it is clear that the Commission, and not the plaintiff States, provided $80 million to North Carolina—wherefore, as a matter of law, only the Commission can claim entitlement to $80 million, either as a measure of damages for breach of the Compact under Counts I and II of the bill of complaint, see Restatement §370, Comment *a*, and §373, or under the unjust enrichment, promissory estoppel, and money-had-and-received theories of recovery in Counts III, IV, and V, see, *e.g.,* Restatement of Restitution §1, Comment *a* (1936). And, it contends, a stand-alone suit by the Commission is barred by sovereign immunity.

With regard to Counts I and II, at least, we disagree. The Commission's claims under those Compact-related Counts are wholly derivative of the States' claims. See *Arizona* v. *California, supra,* at 614. The Commission is "a legal entity separate and distinct from" the States that are parties to the Compact. Art. 4(M)(1), 99 Stat. 1877. Since it is not a party it has neither a contractual right to performance by the party States nor enforceable statutory rights under Article 5 of the Compact, see *Bennett* v. *Spear*, 520 U. S. 154, 162–163 (1997). The Compact does, however, authorize the Commission to "act or appear on behalf of any party [S]tate or [S]tates . . . as an intervenor or party in interest before . . . any court of law," Art. 4(E)(10), 99 Stat. 1875, and it is obviously in this capacity that the Commission seeks to vindicate the *plaintiff States'* statutory and contractual rights in Counts I and II. Its Count I and Count II claims therefore rise or fall with the claims of the States. While the Commission may not bring them in a stand-alone action under this Court's original jurisdiction, see §1251(a), it may assert them in

this Court alongside the plaintiff States, see *Arizona* v. *California*, 460 U. S., at 614. The summary judgment disallowing the underlying claims on their merits renders the sovereign immunity question with regard to any *relief* the Commission alone might have on those claims moot.

Counts III–V, which do not rely upon the Compact, stand on a different footing. As to them, while the Commission again seemingly makes the same claims and seeks the same relief as the States, it is conceivable that as a matter of law the Commission's claims are not identical. The Commission can claim restitution as the party that paid the money to North Carolina; the other plaintiffs cannot claim it on that basis. Whether this means that the claims are not identical for *Arizona* v. *California* purposes, and that the Commission's Counts III–V claims must be dismissed on sovereign immunity grounds, is a question that the Special Master declined to resolve until the merits issues were further clarified. We have approved his deferral of those issues, and we likewise approve his deferral of the related sovereign immunity issue.

\* \* \*

We overrule the exceptions of Plaintiffs and North Carolina to the Special Master's Reports, and we adopt the recommendations of the Special Master. We grant North Carolina's motion to dismiss Count I. We grant North Carolina's motion for summary judgment on Count II. We deny Plaintiffs' motions for judgment on Counts I and II. And we deny without prejudice North Carolina's motion to dismiss the Commission's claims on the grounds of sovereign immunity and its motion for summary judgment on Counts III–V.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

No. 132, Orig.

STATE OF ALABAMA, STATE OF FLORIDA, STATE OF
TENNESSEE, COMMONWEALTH OF VIRGINIA, AND
SOUTHEAST INTERSTATE LOW-LEVEL RADIO-
ACTIVE WASTE MANAGEMENT COMMISSION,
PLAINTIFFS *v.* STATE OF NORTH CAROLINA

ON EXCEPTIONS TO THE PRELIMINARY AND SECOND REPORTS
OF THE SPECIAL MASTER

[June 1, 2010]

JUSTICE KENNEDY, with whom JUSTICE SOTOMAYOR
joins, concurring in part and concurring in the judgment.

The Court is correct, in my view, to conclude that we
may not "add provisions to a federal statute." *Ante*, at 20.
Plaintiffs do not request as much, however, in contending
that North Carolina was required by the Compact to carry
out its obligations in good faith. Rather, plaintiffs' argu-
ment is that the Compact's terms, properly construed,
speak not only to the specific duties imposed upon the
parties but also to the manner in which those duties must
be carried out. This is an interpretive argument familiar
to contract disputes. See, *e.g.,* Restatement (Second) of
Contracts §205 (1979) (hereinafter Restatement).

As the opinion for the Court notes, congressional con-
sent to an interstate compact gives it the status of a fed-
eral statute. See *ante*, at 20. This is an apt and proper
way to indicate that a compact has all the dignity of an
Act of Congress. And that is surely what was meant in
*New Jersey* v. *New York*, 523 U. S. 767, 811 (1998), where
it was stated that the Court may not "'order relief incon-
sistent with [the] express terms'" of a compact. *Ante*, at
20 (quoting *New Jersey*; alteration in original; some inter-

nal quotation marks omitted); see also *Cuyler* v. *Adams*, 449 U. S. 433, 438 (1981) ("[C]ongressional consent transforms an interstate compact . . . into a law of the United States").

From this principle, however, it simply does not follow that a law's nature and origin as a compact must be dismissed as irrelevant. Like a treaty, a compact represents an agreement between parties. See *New Jersey*, *supra*, at 831 (SCALIA, J., dissenting) ("[T]he Compact here is of course a treaty"). The Court's duty in interpreting a compact involves ascertaining the intent of the parties. See *Sullivan* v. *Kidd*, 254 U. S. 433, 439 (1921) ("[T]reaties are to be interpreted upon the principles which govern the interpretation of contracts . . . with a view to making effective the purposes of the high contracting parties"); *Wright* v. *Henkel*, 190 U. S. 40, 57 (1903) ("Treaties must receive a fair interpretation, according to the intention of the contracting parties"). Carrying out this duty may lead the Court to consult sources that might differ from those normally reviewed when an ordinary federal statute is at issue. That much is surely implicit in the Court's reference to contract law principles elsewhere in its opinion in the instant case. See, *e.g., ante*, at 14 ("[T]he parties' course of performance under the Compact is highly significant"); *ibid.* (citing the Restatement); *id.,* at 18–19 (same); see also *New Jersey*, *supra*, at 830–831 (SCALIA, J., dissenting) (construing a compact in light of "hornbook contracts law that the practical construction of an ambiguous agreement revealed by later conduct of the parties is good indication of its meaning").

That said, it is quite correct to hold here that the reasonable expectations of the contracting States, as manifested in the Compact, do not reveal an intent to limit North Carolina's power of withdrawal. For purposes of rejecting this argument, it is sufficient to note—as the Court does—that the Compact permits any State to with-

draw; imposes no limitation on this right; and explicitly provides that the Compact shall not be construed to abridge the sovereign rights of any party State. See *ante*, at 20–21. Federalism concerns also counsel reluctance to find that a State has implicitly restricted its sovereignty in such a manner.

   The Court is therefore correct to reject plaintiffs' final exception. With these observations, I join the Court's opinion with the exception of Part II–E.

# SUPREME COURT OF THE UNITED STATES

No. 132, Orig.

STATE OF ALABAMA, STATE OF FLORIDA, STATE OF
TENNESSEE, COMMONWEALTH OF VIRGINIA, AND
SOUTHEAST INTERSTATE LOW-LEVEL RADIO-
ACTIVE WASTE MANAGEMENT COMMISSION,
PLAINTIFFS *v.* STATE OF NORTH CAROLINA

ON EXCEPTIONS TO THE PRELIMINARY AND SECOND REPORTS
OF THE SPECIAL MASTER

[June 1, 2010]

CHIEF JUSTICE ROBERTS, with whom JUSTICE THOMAS
joins, concurring in part and dissenting in part.

The parties to this case are Alabama, Florida, North
Carolina, Tennessee, Virginia, and the Southeast Inter-
state Low-Level Radioactive Waste Management Commis-
sion. One of these things is not like the others: The Com-
mission is not a sovereign State. The Court entertains its
suit—despite North Carolina's sovereign immunity—
because the Commission "asserts the same claims and
seeks the same relief as the other plaintiffs." *Ante,* at 23.
Our Constitution does not countenance such "no harm, no
foul" jurisdiction, and I respectfully dissent.

The Court has made this mistake before. In *Arizona* v.
*California*, 460 U. S. 605 (1983), we allowed Indian Tribes
that could not sue sovereign States to piggyback on the
claims of the United States, which could. We reasoned
that once the United States had initiated suit, the state
defendants could "no longer . . . assert [their] immunity
with respect to the subject matter of [the] action," so the
Tribes were free to pile on and join the suit. *Id.,* at 614.
Today the Court retraces *Arizona*'s steps, quoting that
case for the proposition that when private plaintiffs "'do

not seek to bring new claims or issues, . . . our judicial power over the controversy is not enlarged . . . , and the States' sovereign immunity protected by the Eleventh Amendment is not compromised.'" *Ante,* at 23 (quoting *Arizona*, *supra,* at 614).

That statement is contrary to the language of the Constitution. The Eleventh Amendment provides:

> "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."

The immunity conferred is against the "commence[ment] or prosecut[ion]" of "any suit in law or equity." There is no carve-out for suits "prosecuted" by private parties so long as those parties "'do not seek to bring new claims or issues.'" *Ante,* at 23 (quoting *Arizona*, *supra,* at 614).

Understandably, the Court's opinion leans heavily on *Arizona*, which has never been squarely overruled. *Ante,* at 23–24. But *Arizona* itself is built on sand. The relevant portion of that opinion is almost wholly unreasoned. It cites only a footnote in a prior case, the pertinent paragraph of which failed even to discuss the State's immunity from private suit. See 460 U. S., at 614 (citing *Maryland* v. *Louisiana*, 451 U. S. 725, 745, n. 21 (1981)). That paragraph addressed only intervention, not sovereign immunity, and the two issues are distinct. See *South Carolina* v. *North Carolina*, 558 U. S. ___, ___, n. 5 (2010) (slip op., at 10, n. 5).

Most importantly, the subsequent development of our sovereign immunity jurisprudence has only undermined *Arizona*'s already weak foundations. We recognized in *Alden* v. *Maine*, 527 U. S. 706, 718 (1999), that the Constitution left intact the States' pre-existing "immunity from private suits"; as the Eleventh Amendment confirms, the

States did not "'surrender . . . this immunity in the plan of the convention.'" *Id.,* at 717 (quoting The Federalist No. 81, p. 487 (C. Rossiter ed. 1961) (A. Hamilton)); see also *Alden*, *supra,* at 718–722, 755–756. There is no reason to suppose that the States, at the founding, made an exception for private suits that happen to mimic other plaintiffs' claims—and neither *Arizona* nor the Court today suggests otherwise.

Whether or not a plaintiff "seeks the same relief" or imposes any "additional defense or liability," *ante,* at 23–24, simply does not matter in light of our recognition that sovereign immunity provides an "immunity from suit," not a "defense to . . . liability." *Federal Maritime Comm'n* v. *South Carolina Ports Authority*, 535 U. S. 743, 766 (2002). As we have explained, "the relief sought by a plaintiff suing a State is irrelevant to the question whether the suit is barred." *Seminole Tribe of Fla.* v. *Florida*, 517 U. S. 44, 58 (1996). Indeed, we have suggested that private parties may not sue even if a court is "precluded . . . from awarding them *any* relief." *Federal Maritime Comm'n*, *supra,* at 766 (emphasis added) (dictum). It is the fact that a private party is allowed to sue a sovereign State—not the burden of litigation or the relief sought—that infringes the immunity of the State. "The Eleventh Amendment is concerned not only with the States' ability to withstand suit, but with their privilege not to be sued." *Puerto Rico Aqueduct and Sewer Authority* v. *Metcalf & Eddy, Inc.*, 506 U. S. 139, 147, n. 5 (1993).

It is therefore impossible for the Court to hear private claims against a nonconsenting State without expanding "our judicial power over the controversy." *Arizona*, *supra,* at 614. Sovereign immunity is a limitation on that power. The similarity of claims may be relevant to joinder or intervention, but those are procedural means of processing claims, not fonts of judicial authority. See *Henderson* v. *United States*, 517 U. S. 654, 664 (1996).

Nor may the Court entertain private claims without "compromis[ing]" "the States' sovereign immunity." *Arizona*, 460 U. S., at 614. As a party, the Commission enjoys legally enforceable rights against the defendant State: It may object to settlement, seek taxation of costs, advance arguments we are obliged to consider, and plead the judgment as res judicata in future litigation. If the Commission truly sought nothing for itself—other than "a full exposition of the issues," Preliminary Report of the Special Master 14—it could have participated as an *amicus*.

The Commission and North Carolina know that more is at stake if the Commission is allowed to sue the State. It is precisely the Commission's status as a *party*, its attempt to "prosecut[e]" a "suit in law or equity . . . against one of the United States," U. S. Const., Amdt. 11, that sovereign immunity forbids.

I would sustain North Carolina's first exception to the Special Master's reports.*

---

*I also join JUSTICE BREYER's opinion and all of the Court's opinion save Parts II–D and III–B. JUSTICE THOMAS joins all but Part III–B of the Court's opinion.

# SUPREME COURT OF THE UNITED STATES

No. 132, Orig.

STATE OF ALABAMA, STATE OF FLORIDA, STATE OF
TENNESSEE, COMMONWEALTH OF VIRGINIA, AND
SOUTHEAST INTERSTATE LOW-LEVEL RADIO-
ACTIVE WASTE MANAGEMENT COMMISSION,
PLAINTIFFS *v.* STATE OF NORTH CAROLINA

ON EXCEPTIONS TO THE PRELIMINARY AND SECOND REPORTS
OF THE SPECIAL MASTER

[June 1, 2010]

JUSTICE BREYER, with whom THE CHIEF JUSTICE joins,
concurring in part and dissenting in part.

I join Parts I, II–A, II–B, and III of the Court's opinion.
Unlike the Court, however, I believe that North Carolina
breached the Southeast Interstate Low-Level Radioactive
Waste Management Compact (Compact) when it sus-
pended its efforts toward building a waste disposal facility.
(THE CHIEF JUSTICE joins all but Parts II–D and III–B of
the Court's opinion.)

Article 5(C) is the critical term of the Compact. It states:

"Each party state designated as a host state for a re-
gional facility shall take appropriate steps to ensure
that an application for a license to construct and op-
erate a facility . . . is filed with and issued by the ap-
propriate authority." Omnibus Low-Level Radioactive
Waste Interstate Compact Consent Act (Consent Act),
99 Stat. 1877.

In September 1986, North Carolina was "designated as a
host state for a regional" low-level nuclear waste disposal
"facility." *Ibid.;* see also App. 417, 432. Soon thereafter,
North Carolina's General Assembly enacted legislation

authorizing a state agency to "site, finance, [and] build" a waste disposal facility. N. C. Gen. Stat. §104G–4 (1987) (repealed 2000). Pursuant to this legislation, a new facility was to be completed by January 1, 1993. *Ibid.*

From August 1987 until December 1997, North Carolina took a series of steps to prepare for the construction of the storage facility. See Brief for North Carolina in Support of Exceptions to Reports of the Special Master 6–8. And while doing so it continually assured its Compact partners that it "remain[ed] committed to fulfilling its obligations to the Compact to serve as the next host state." App. 92 (Letter from James G. Martin, Governor of North Carolina, to Carroll R. Campbell, Jr., Governor of South Carolina (October 25, 1990)); Statement of Undisputed Material Facts ¶¶24–26, 28, 33, 37, 39 (detailing press releases, gubernatorial letters, and other statements made by North Carolina expressing its commitment to its Compact obligations).

But North Carolina never secured a license, never obtained adequate funding, and never began construction on a new facility. See Second Report of Special Master 2–3 (hereinafter Second Report). Eventually, the State simply stopped trying: On December 19, 1997, North Carolina informed its fellow member States that it would "commence the orderly shutdown" of the waste disposal "project." App. 319. After this point, North Carolina admittedly took no further steps toward obtaining a license or building a facility before withdrawing from the Compact in July 1999. *Id.*, at 460 (North Carolina Admissions ¶11 (North Carolina "did not [after 1997] take additional steps to . . . license a waste disposal facility")); Second Report 10 ("The parties do not dispute that North Carolina did not take additional steps to pursue a license for a waste facility" after December 1997).

Whatever one might think of the sufficiency of North Carolina's activities during the previous decade, I do not

see how the Court can find that a year and a half of doing
nothing—which North Carolina admits it did between
December 1997 and July 1999—constitutes "tak[ing]
appropriate steps." If a student promises to "take appro-
priate steps to ensure" that he will pass the bar and then
refuses to study, has he not broken his promise? More to
the point, if a builder promises that he will "take appro-
priate steps to ensure" that a customer will be able to
move into a new home in two years, and then does nothing
at all, has the builder not broken his promise?

As the majority notes, "[o]ther contemporaneously en-
acted interstate compacts" delineated a host State's obli-
gations in more detail than the Southeast Compact does.
*Ante,* at 16–17. But this fact may just as easily be read to
indicate what the parties here intended, rather than, as
the majority argues, what they did not intend. Regard-
less, the language of the Compact and the context in which
it was enacted—as part of a congressional effort to en-
courage regional solutions to this Nation's low-level radio-
active waste problem, see Consent Act, 99 Stat. 1859; Low-
Level Radioactive Waste Policy Act, §4(a)(1), 94 Stat.
3348—both indicate that North Carolina was supposed to
take "appropriate steps" to build a low-level radioactive
waste disposal facility. And North Carolina's General
Assembly passed a state statute recognizing and accepting
this responsibility. See N. C. Gen. Stat. §104G–4 (creating
a state agency to "site, finance, [and] build" a waste dis-
posal facility). How can it be that two years of inactivity
followed by withdrawal satisfies this promise?

The answer, says the Court, is that any further "appro-
priate steps" would have cost a significant amount of
money. *Ante,* at 14–15. In 1997, the Southeast Interstate
Low-Level Radioactive Waste Management Commission
(Commission), the entity responsible for administering the
Compact, made clear that it would not advance North
Carolina any more money toward building a facility. See

App. 315. In response, North Carolina concluded that it was unwilling to fund the rest of the project itself. See *id.*, at 317–319. And the Court agrees that it would have been "imprudent" for North Carolina to spend further funds, in light of the Commission's refusal to do so also. *Ante*, at 15–16.

But this is an odd excuse. If a builder promises to "take appropriate steps" to build me a house, the fact that he runs out of funds would not normally excuse his breaking his promise—at least if it is he, and not I, who is responsible for financing the project. See 2 E. Farnsworth, Contracts §9.6, p. 638 (3d ed. 2004) (Farnsworth) (courts "generally" conclude that "additional expense" "does not rise to the level of impracticability" so as to excuse a party from performance). And here it is North Carolina, and not anyone else, who bears ultimate responsibility for finding the funds.

The text, structure, and purpose of the Compact all demonstrate this fact. As the Court recognizes, *ante,* at 2, the Compact expressly provides that the Commission "is not responsible for any costs associated with . . . the creation of any facility," Art. 4(K)(1), 99 Stat. 1876. Rather, the Compact States determined that each "party state" should take a turn as the "host state," during which time that State would be obligated to build a facility and then operate it for 20 years. See Art. 3(A), *id.*, at 1873; Art. 5(A), *id.*, at 1877; Art. 5(C), *ibid.;* Art. 5(E), 103 Stat. 1289; see also Art. 3(C), 99 Stat. 1873–1874 ("Host states are responsible for the availability, the subsequent post-closure observation and maintenance, and the extended institutional control of their regional facilities"). The host State would then recover its upfront construction expenses from the considerable fees and surcharges charged to the waste generators served by the facility. N. C. Gen. Stat. §§104G–15(a)–(b) (repealed 2000) ("It is the intent of the General Assembly that the cost of all activities [toward

siting, building, and operating a facility] be borne by the waste generators" who use it); Brief for Plaintiffs in Surreply to North Carolina's Reply 1, n. 1 (noting that a disposal facility in South Carolina collected over $47 million in fees in 2008).

Of course, as the majority notes, South Carolina's withdrawal from the Compact *could* have affected North Carolina's ability to "recoup" its "construction costs." *Ante,* at 18. But, as far as I am aware, North Carolina did not seriously seek to amend the Compact when South Carolina departed (even though the State had sought and obtained an amendment previously, see *ante,* at 20, n. 4; Brief for North Carolina in Reply to Exceptions By Plaintiffs to Reports of the Special Master 27), nor has it argued to this Court that South Carolina's departure voided its contractual obligations. Indeed, there is evidence in the record indicating that, even after South Carolina left the Compact, North Carolina continued to believe that the operation of a waste disposal facility presented a substantial financial opportunity. App. 255, 266 (Attachment to Letter from John H. MacMillan, Executive Director, North Carolina Low-Level Radioactive Waste Management Authority, to Richard S. Hodes, M. D., Chairman, Southeast Compact Commission (Dec. 13, 1996) (enclosing a business plan identifying $600 million in cost savings that could provide a "substantial return" on the "investment needed to put the North Carolina facility into operation")).

I thus cannot conclude, as the majority does, that the Compact's rotational design, as I understand it, is "foolish." *Ante,* at 18. Rather, the Compact's structure represents what, in my view, was a understandable decision by the contracting States, all of whom needed a waste disposal facility, to bind themselves together so that each would take a turn "bear[ing] the cost of building" the necessary facility. Preliminary Report of Special Master 21 (citing Art. 4(K), 99 Stat. 1876–1877); see Brief for

Rocky Mountain Low-Level Radioactive Waste Compact Board et al. as *Amici Curiae* 16–18. This rotational approach is surely a sensible solution to the problems caused by the widespread existence of low-level nuclear waste and the political unpopularity of building the necessary facilities to house it. See *id.*, at 13–16; *New York* v. *United States*, 505 U. S. 144, 149–151 (1992).

The only contrary evidence—*i.e.*, that indicates that North Carolina did not bear ultimate funding responsibility—consists of the fact that the Commission voluntarily advanced North Carolina nearly $80 million between 1988 and 1998 in order to help it defray its costs. Second Report 16. The Court believes that this "course of performance" demonstrates that, once the Commission turned off its monetary spigot, North Carolina was no longer required to do anything further. *Ante,* at 14–15. But why? If I advance my builder *half* the cost of a building, I have not thereby promised to advance him the *whole* cost. This is particularly true when the contract says I am responsible for *none* of the cost of the building. At the very least, something more in the circumstances would have to show that additional expenditure had become a reasonable expectation.

In this case, nothing suggests that North Carolina could reasonably expect further financing assistance. Indeed, I can find nothing in the majority's opinion, or the record, that suggests that the Commission or the other Compact States intended to let North Carolina off the hook. And numerous documents indicate precisely the opposite—that despite the Commission's funding assistance, North Carolina was still responsible for funding the project. See, *e.g.,* App. 63 (Resolution (Feb. 9, 1988) ("The Commission, although not obligated to do so under the Compact," provides funding for North Carolina)); *id.*, at 215 (Letter from Richard S. Hodes, M. D., Chairman, Southeast Compact Commission, to James B. Hunt, Governor of North Caro-

lina (Jan. 5, 1996) ("At some point, Commission funds will no longer be available to North Carolina . . . , and North Carolina will need to make alternate plans . . .")); *id.*, at 75 (Press Release by James G. Martin, Governor of North Carolina (Nov. 8, 1989) ("'The task of siting and operating a low-level radioactive waste disposal facility is a commitment the state of North Carolina has made and one which I am personally committed to keeping'")); *id.*, at 92 (Letter from Governor of North Carolina, to Governor of South Carolina ("North Carolina remains committed to fulfilling its obligations to the Compact to serve as the next host state"); *id.*, at 183 (Letter from James B. Hunt, Jr., Governor of North Carolina, to David M. Beasley, Governor of South Carolina (Mar. 14, 1995) ("Let me assure you that North Carolina is committed to honoring its obligation to the Compact")); Statement of Undisputed Material Facts ¶¶28, 33, 39 (other public statements about North Carolina's commitment to building a facility).

Without better evidence of a reallocation of funding responsibility, I can only conclude that North Carolina remained under an obligation to "take appropriate steps" at all times relevant to this case. And North Carolina admittedly took *no steps* towards building a disposal facility from December 1997 and July 1999: It did no in-depth study of the further financing that might be necessary; it made no serious effort to look for alternative funding; the Executive of the State did not ask its legislature for any appropriation. Rather, North Carolina simply withdrew from the Compact. *Ante,* at 5.

Of course, North Carolina was free to withdraw from the Compact. Art. 7(G), 99 Stat. 1879–1880. But that fact does not repair what, in my view, was a breach of a key contractual provision. See *Franconia Associates* v. *United States*, 536 U. S. 129, 142–143 (2002) ("Failure by the promisor to perform . . . establishes an immediate breach"); Restatement (Second) of Contracts §235(2) (1979) ("When

performance of a duty under a contract is due *any non-performance* is a breach" (emphasis added)); 2 Farnsworth §8.8, at 471.

With respect, I dissent.