**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**November 9, 2010**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

ENERGYSOLUTIONS, LLC,

       Plaintiff-Appellee,

    v.

STATE OF UTAH,

       Defendant-Appellant,

ROCKY MOUNTAIN LOW-LEVEL
RADIOACTIVE WASTE COMPACT,

       Defendant-Intervenor.

No. 09-4122

----------------------------------------------

ENERGYSOLUTIONS, LLC,

       Plaintiff-Appellee,

    v.

ROCKY MOUNTAIN LOW-LEVEL
RADIOACTIVE WASTE COMPACT,

       Defendant-Appellant.

No. 09-4123

----------------------------------------------

ENERGYSOLUTIONS, LLC,

       Plaintiff-Appellee,

    v.

No. 09-4124

NORTHWEST INTERSTATE COMPACT ON LOW-LEVEL RADIOACTIVE WASTE MANAGEMENT, and MICHAEL GARNER, solely in his official capacity as the Executive Director of the Northwest Interstate Compact on Low-Level Radioactive Waste Management,

Defendants-Appellants,

ROCKY MOUNTAIN LOW-LEVEL RADIOACTIVE WASTE COMPACT,

Defendant-Intervenor.

----------------------------------------------

STATE OF NEW MEXICO, and MIDWEST INTERSTATE LOW-LEVEL RADIOACTIVE WASTE MANAGEMENT COMMISSION, and ATLANTIC INTERSTATE LOW-LEVEL RADIOACTIVE WASTE COMPACT, CENTRAL INTERSTATE LOW-LEVEL RADIOACTIVE WASTE COMPACT, CENTRAL MIDWEST LOW-LEVEL RADIOACTIVE WASTE COMPACT, SOUTHEAST INTERSTATE LOW-LEVEL RADIOACTIVE WASTE COMPACT, TEXAS LOW-LEVEL RADIOACTIVE WASTE DISPOSAL COMPACT, AND COUNCIL OF STATE GOVERNMENTS,

Amici Curiae.

Nos. 09-4122, 09-4123, and 09-4124

**APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH (D.C. NO. 2:08-CV-352-TS-SA)**

-2-

Denise Chancellor, Assistant Attorney General (Mark L. Shurtleff, Utah Attorney General, and Fred G Nelson, Assistant Attorney General, with her on the briefs), Office of the Utah Attorney General, Salt Lake City, Utah, for Defendant-Appellant State of Utah.

Barbara J.B. Green, Sullivan Green Seavy, LLC, Boulder, Colorado (James S. Lowrie, Lewis M. Francis, and Ryan M. Harris, Jones Waldo Holbrook & McDonough PC, Salt Lake City, Utah, and Richard L. Masters, Masters, Mullins & Arrington, Louisville, Kentucky, with her on the briefs), for Intervenor-Defendant-Appellant Rocky Mountain Low-Level Radioactive Waste Compact.

Kristen K. Mitchell, Assistant Attorney General (Robert M. McKenna, Attorney General, and Alice M. Blado, Assistant Attorney General, with her on the briefs), Office of the Washington Attorney General, Olympia, Washington, for Defendants-Appellants Northwest Interstate Compact on Low-Level Radioactive Waste Management and Michael Garner, solely as its Executive Director.

Michael S. Lee, Howrey LLP (Jared C. Fields, Howrey LLP, and Robert S. Clark and Timothy B. Smith, Parr Brown Gee & Loveless with him on the brief) Salt Lake City, Utah, for Plaintiff-Appellee.

Gary K. King, Attorney General, and David K. Thomson, Deputy Attorney General, Santa Fe, New Mexico, on brief for Amicus Curiae State of New Mexico in support of Appellants.

Richard Ihrig, Ann Kennedy, and Patrick Compton, Lindquist & Vennum PLLP, Minneapolis, Minnesota, on brief for Amicus Curiae Midwest Interstate Low-Level Radioactive Waste Management Commission in support of Appellants.

Henry W. Jones, Jr., and Lori P. Jones, Jordan Price Wall Gray Jones & Carlton, PLLC, Raleigh, North Carolina, and Robert C. Wilson, Jackson, Sjoberg, McCarthy & Wilson, L.L.P., Austin, Texas, on brief for Amicus Curiae Atlantic Interstate Low-Level Radioactive Waste Compact, Central Interstate Low-Level Radioactive Waste Compact, Central Midwest Low-Level Radioactive Waste Compact, Southeast Interstate Low-Level Radioactive Waste Compact, Texas Low-Level Radioactive Waste Disposal Compact, and Council of State Governments in support of Appellants.

Before **TACHA**, **ALARCÓN**[*], and **TYMKOVICH**, Circuit Judges.

_____

**TYMKOVICH**, Circuit Judge.

_____

The issue in this case is whether the Northwest Interstate Compact on Low-Level Radioactive Waste allows its member states to exclude low-level radioactive waste from disposal at a Utah site.

EnergySolutions is the owner and operator of a facility for the disposal of low-level radioactive waste located in Clive, Utah. Utah is a member state of the Northwest Compact, and required EnergySolutions to obtain permission pursuant to the Compact for the importation and disposal of low-level waste from a decommissioned reactor in Italy. The member states, including Utah, voted to deny this approval, based on exclusionary authority it claimed through the federal statute approving the terms of the Compact. EnergySolutions contends the Clive Facility should not be subject to the authority of the Northwest Compact. It claims the Compact has limited authority only over regional disposal facilities, which does not include the Clive Facility.

The district court concluded the Northwest Compact does not regulate the disposal of waste at the Clive Facility. We disagree. The terms of the Compact control in this situation, and the member states were within the bounds of their authority when they denied permission regarding this waste.

_____

[*] The Honorable Arthur L. Alarcón, Senior Circuit Judge, United States Court of Appeals for the Ninth Circuit, sitting by designation.

-4-

Exercising our jurisdiction under 28 U.S.C. § 1291, we REVERSE and REMAND.

## I. BACKGROUND

Because of the complicated interplay among the statutes relevant to this case, a short review of their legislative history is helpful. We therefore begin with a discussion of the statutory background and a description of the factual history relevant to the dispute.

*A. Statutory Background*

"We live in a world full of low level radioactive waste." *New York v. United States*, 505 U.S. 144, 149 (1992). Many important industries and manufacturing processes generate low-level radioactive waste (LLRW), and representative types of this waste include contaminated medical clothing and equipment, tools, and the remains of animals exposed to radiation during laboratory testing. *See NRC: Low-Level Waste*, http://www.nrc.gov/waste/low-level-waste.html (last visited August 26, 2010). LLRW is the least radioactive type of radioactive waste, *see* 10 C.F.R § 61.2, but precautions must still be taken for its safe disposal.

Despite these common origins and the resulting large volumes of waste, by the end of the 1970s, the entire nation had only three functioning disposal sites for LLRW. *New York*, 505 U.S. at 150. Two of those sites were forced to close temporarily in 1979, raising the specter of LLRW with no place to go. *Id.* At the same time, the scarcity of disposal sites raised the spectre that host states would become the nation's "dumping grounds" for LLRW. *Id.* at 190 (White, J., concurring in part and dissenting in part).

-5-

Policymakers agreed it was essential to encourage states to build more LLRW disposal facilities, or at the very least, provide incentives for the existing disposal sites to remain open. Hosting a disposal site, for example, would be less onerous if the host state could limit the amount of waste crossing its borders. But, due to the constitutional restrictions on state protectionism, a host state could not prevent waste from entering its disposal site based on the state of its origin, and therefore give preference to waste generated within its own borders. Under the Constitution's so-called dormant Commerce Clause, the "clearest example of [an abuse] is a law that overtly blocks the flow of interstate commerce at a State's borders." *City of Philadelphia v. New Jersey*, 437 U.S. 617, 624 (1978).

Because more disposal sites were required, and few states were willing to risk building a site for waste generated mostly in other states, Congress in 1980 enacted the Low-Level Radioactive Waste Policy Act, Pub. L. No. 96-573, 94 Stat. 3347 (1980) (1980 Act). This legislation gave states the authority under the Constitution's Compact Clause, U.S. Const. art. I § 10, to enter into interstate agreements, or compacts, to deal with LLRW on a regional basis, and statutorily preempted dormant Commerce Clause concerns. After a transition period, congressionally-approved compacts would have the force of federal law to exclude LLRW generated outside of the compact region, starting in 1986.

Rather than creating a uniform federal law to directly regulate LLRW disposal, the 1980 Act encouraged states to draft their own agreements regarding this waste. These

customized compacts could deal with regional concerns and encourage compromises between states that would be mutually beneficial. The 1980 Act thus stated it was "the policy of the Federal Government that each State is responsible for providing for the availability of capacity either within or outside the State for the disposal of low-level radioactive waste generated within its borders." 1980 Act § 4(a)(1)(A). Beyond this statement, the Act provided no incentives to enter into a compact, nor did it include any penalties for a failure to provide the capacity to handle the waste.

Perhaps unsurprisingly, as the 1986 effective date of the statute approached, the only compacts that had been formed were predicated on the three already existing disposal sites. *New York*, 505 U.S. at 151. No new LLRW disposal sites had been opened in the interim, and the nation once again faced the possibility of having nowhere to dispose the waste generated in the 31 states that were not members of a regional compact. *Id.*

Congress took action again. This time it enacted a more detailed statute, providing penalties for states failing to provide disposal capacity, as well as increased financial benefits for states complying with a series of benchmarks related to creating new LLRW disposal sites. This second legislative attempt is known as the Low-Level Radioactive Waste Policy Amendments Act of 1985, Pub. L. No. 99-240, 99 Stat. 1842, Title I (codified at 42 U.S.C. §§ 2021b–2021j) (1985 Act). In addition to the "carrots and

sticks" related to the benchmarks,[1] the 1985 Act provided more specific definitions for terms not defined in the 1980 Act.  *See* 42 U.S.C. § 2021b.

At the same time, Congress passed the Omnibus Low-Level Radioactive Waste Interstate Compact Consent Act, Pub. L. No. 99-240, 99 Stat. 1842, Title II (codified at 42 U.S.C. § 2021d note) (Consent Act).  The Consent Act provided congressional approval for several interstate compacts already ratified by member states, including the Northwest Compact, *id.* § 221, and the Rocky Mountain Low-Level Radioactive Waste Compact, *id.* § 226.[2]

Given this legislative history, we turn to the statute that created the Northwest Compact, since it contains the complete agreement among the states at issue here.  Next, we will discuss the 1985 Act, since its modifications and limitations make sense only in the context of their application to an existing compact.

1.  Northwest Compact

In January 1986, Congress explicitly gave its consent "to the States of Alaska, Hawaii, Idaho, Montana, Oregon, Utah, Washington, and Wyoming to enter into the Northwest Interstate Compact on Low-Level Radioactive Waste Management."  Consent Act § 221.  In so doing, Congress declared that "*each of the compacts set forth in*

---

[1]  The Supreme Court upheld most of these provisions in *New York*, but ruled that a provision requiring states to take title to the waste if they did not provide for its disposal was unconstitutional.  *See id.* at 177.

[2]  The compacts of some amici were also ratified at this time, and others at a later date.

*subtitle B [including the Compact] is in furtherance of the Low-Level Radioactive Waste Policy Act [1980 Act]*." *Id.* § 211 (emphasis added). But the consent is not unconditional—it is "granted subject to the provisions of the Low-Level Radioactive Waste Policy Act, as amended," (the 1985 Act), and "only for so long as the regional commission, committee, or board established in the compact complies with all of the provisions of such Act." *Id.* § 212.

Under the Northwest Compact, a member state can regulate disposal at a "*facility*," which is defined as "any site, location, structure, or property used or to be used for the storage, treatment, or disposal of low-level waste, excluding federal waste facilities." *Id.* § 221, Art. II(1). Another provision of the Compact, Article IV—titled "Regional Facilities"—provides that "[n]o facility located in any party state may accept low-level waste generated outside of the region comprised of the party states," except as authorized by party states. *Id.*, Art. IV(2). We use the term "exclusionary authority" to describe this ability to exclude out-of-region waste.

Article V goes on to establish the Northwest Low-Level Waste Compact Committee (Northwest Committee). The Northwest Committee is comprised of one official from each party state, designated by that state's governor. Additionally,

> the committee may enter into arrangements with states[,] provinces, individual generators, or regional compact entities outside the region comprised of the party states for access to facilities on such terms and conditions as the committee may deem appropriate. However, it shall require a two-thirds (2/3) vote of all such members, including the affirmative vote of the member of any party state in which a facility

-9-

affected by such arrangement is located, for the committee to enter into such arrangement.

*Id.*, Art. V.

Since the Northwest Compact is subject to the provisions of the 1985 Act, we turn next to it.

2. 1985 Act

The 1985 Act encourages states to form regional compacts to provide for the disposal of LLRW. The 1985 Act does so by setting forth in some detail the states' responsibilities for disposal, *see 42 U.S.C.* § 2021c, allowing host states to charge a surcharge for the disposal of waste, *see id.* § 2021e(d)(1), and establishing penalties for states that do not make the required progress toward establishing disposal capacity, *see id.* § 2021e(d)(2).

Additionally, the 1985 Act made important modifications to the 1980 Act. One key change was to recognize the unworkability of the deadline that allowed disposal facilities to exclude out-of-region waste as of January 1, 1986. With the deadline, the 31 states who were not members of compacts containing disposal sites would soon have had no place to send their LLRW. In light of this pressing concern, the 1985 Act created a more gradual transition period, lasting from January 1, 1986, to January 1, 1993, during which non-host states (and compacts) were required to take steps towards providing disposal capacity, and host states could begin collecting higher surcharges for disposal. *See id.* § 2021e.

By enacting the 1985 Act, Congress repealed the 1980 Act. Its language in doing so was arguably ambiguous, but the effect of the language was not. Congress stated that the 1980 Act "is amended by striking out sections 1, 2, 3, and 4 and inserting in lieu thereof" the 1985 Act. 1985 Act § 102. The 1980 Act only had four sections, all of which were struck and replaced by the 1985 Act.

Several additional portions of the 1985 Act are relevant to our discussion. First, the 1985 Act defines a "regional disposal facility" as "a non-Federal low-level radioactive waste disposal facility in operation on January 1, 1985, or subsequently established and operated under a compact." 42 U.S.C. § 2021b(11). Second, the 1985 Act explicitly limits the effect of regional compacts on federal law:

> Except as expressly provided in sections 2021b to 2021j of this title, nothing contained in sections 2021b to 2021j of this title or any compact may be construed to limit the applicability of any Federal law or to diminish or otherwise impair the jurisdiction of any Federal agency, or to alter, amend, or otherwise affect any Federal law governing the judicial review of any action taken pursuant to any compact.[3]

42 U.S.C. § 2021d(b)(4).

*B. Factual and Procedural Background*

The 1985 Act, regrettably, has been less than entirely effective in reaching its goal of encouraging new LLRW disposal sites. In general, most interstate compacts not

---

[3] The 1985 Act also describes several areas in which Congress did not intend to grant additional authority to states or compacts. For instance, they may not establish standards for the handling and storage of LLRW that conflict with federally established standards, or otherwise interfere with the Nuclear Regulatory Commission's functions. *See* 42 U.S.C. § 2021d(b)(3).

-11-

organized around an already existing disposal site have fallen victim to a basic trend: a state is recognized as the "host state" for the compact; the designated host state begins the process of locating an acceptable site for LLRW disposal; political obstacles prevent the host state from making progress toward this goal; and finally, the host state, unable to comply with its obligations under the compact, withdraws or is removed by the other member states. *See, e.g.*, *Alabama v. North Carolina*, 130 S. Ct. 2295 (2010) (North Carolina is sued after withdrawing from Southeast Interstate Low-Level Radioactive Waste Compact); *Entergy Arkansas, Inc. v. Nebraska*, 358 F.3d 528 (8th Cir. 2004) (outlining Nebraska's difficulties with the Central Interstate Low-Level Radioactive Waste Commission); *Nuclear Waste Dump Group Cans Michigan*, WIS. ST. J., July 25, 1991, *available at* 1991 WLNR 3209213 (discussing vote to expel Michigan taken by the Midwest Interstate Low-Level Radioactive Waste Commission).

In contrast to these difficulties, we can look to the Clive Facility, owned and operated by EnergySolutions.[4]  This facility is the only currently-operating LLRW disposal site that began operations *after* the 1980 and 1985 Acts.  And according to data provided by the Nuclear Regulatory Commission (NRC), the Clive Facility processed over 97 percent of the national volume of disposed LLRW from 2005 to 2008.  *See NRC:*

---

[4] EnergySolutions also owns and operates the LLRW disposal facility located in Barnwell, South Carolina.  Although the parties do not argue the question of whether the Clive Facility meets the 1985 Act's definition of a regional disposal facility, it is clear the phrase "established and operated under a compact" does not mean that the facility must be owned or operated *by* a compact, since the Barnwell Facility is unquestionably a regional disposal facility.

*Low-Level Waste Disposal Statistics*, http://www.nrc.gov/waste/llw-disposal/licensing/statistics.html (last visited August 26, 2010).

Utah, where the Clive Facility is located, is a member of the Northwest Compact. In 1991, Utah issued the necessary licenses to allow the Clive Facility to begin disposal of LLRW. In doing so, Utah specifically required the Clive Facility, through a condition in its license, to obtain permission from the Northwest Committee before disposing of any radioactive waste: "[EnergySolutions] shall not accept low-level radioactive waste generated outside the region ... unless the [approval] provisions of Articles IV and V of the Compact are met." (Aplt. App. 426). After its opening, the Clive Facility on a few occasions sought and received permission from the Northwest Committee to accept out-of-region LLRW. On other occasions, the Northwest Committee denied permission for out-of-region waste, and EnergySolutions accepted this determination. *See, e.g.*, JA 318 (letter from Envirocare, EnergySolutions' predecessor in interest, acknowledging the Northwest Compact "does not allow for the receipt" of the type of out-of-region waste a potential client wished to dispose of at the Clive Facility, and therefore that waste was "not acceptable at our facility").

The Clive Facility is not the only LLRW disposal site located within the boundaries of the Northwest Compact—the Northwest Compact was formed around the pre-existing disposal site in Richland, Washington.[5] At the time Utah issued the Clive

_____

[5] The Richland facility is owned by U.S. Ecology, also a private corporation.

-13-

Facility license, it was clear the Richland facility was, and would continue to be, the primary "regional disposal facility" for the Northwest Compact, a term defined in the 1985 Act. As a practical matter, this meant the Richland facility would be used to dispose of all LLRW generated within the Northwest Compact region, while the Clive Facility would accept out-of-region waste as approved by the Committee.

This case arose from a dispute over the disposal of waste from Italy. In 2007, EnergySolutions entered into an agreement to decommission a series of nuclear power plants located in Italy. As part of this plan, EnergySolutions would permanently dispose of the resulting waste categorized as LLRW in its Clive Facility. EnergySolutions applied to the NRC for permission to import this waste into the United States. Rather than approve the request, the NRC indicated it would defer to the judgment of the Northwest Compact. *See* Aple. Br. at 17. Facing political opposition from Utah, the Northwest Committee voted unanimously to deny permission to import this waste. *See* JA 210 (Utah governor directing Compact representative "to vote against any proposals for foreign waste to come in to Utah").[6]

EnergySolutions filed suit against the Northwest Compact, claiming (1) the Northwest Compact does not have statutory authority over the Clive Facility; (2) federal law preempted the decision to exclude foreign-generated LLRW; and (3) the decision to

_____

[6] Since Utah is the host state for the Clive Facility, Article V of the Northwest Compact grants the Utah representative veto power over any import decisions of the Northwest Committee.

exclude foreign-generated LLRW violated the dormant Commerce Clause. The state of Utah and the Rocky Mountain Compact intervened as defendants.

On cross-motions for summary judgment, the district court ruled in favor of EnergySolutions on the first claim[7] and did not rule on the second two claims, since the ruling on the first rendered the others moot. *See EnergySolutions, LLC v. NW Interstate Compact on Low-Level Radioactive Waste Mgmt.*, No. 2:08-CV-352 TS, 2009 WL 1392836 (D. Utah May 15, 2009). The district court concluded the LLRW interstate compacts, including the Northwest Compact, only had the authority explicitly granted them in the 1980 and 1985 Acts. Because the district court concluded the Clive Facility was not a "regional disposal facility" as defined in the 1985 Act, it held the Northwest Compact did not have the authority to exclude foreign-generated waste from the Clive Facility.

This appeal followed.

## II. ANALYSIS

The dormant Commerce Clause forbids states from discriminating against articles of commerce based on the article's state of origin. *See City of Philadelphia*, 437 U.S. at 623–24. The doctrine applies even to items that are not intrinsically valuable and find their primary worth in the price one will pay for their disposal—trash, for instance, *id.* at

---

[7] The district court granted summary judgment on the first claim only in part—it concluded the Northwest Compact had authority over the disposal of in-region waste, and therefore could prevent such waste from being disposed of at the Clive Facility. None of the parties challenges this conclusion on appeal.

622–23, or LLRW, *New York*, 505 U.S. at 159–60.  The "dormant" aspect of this doctrine

indicates it is only applicable when Congress has *not* acted in regard to the interstate

commerce at issue—Congress can and does waive the restrictions of this doctrine by

explicitly consenting to state regulation of interstate commerce.  *See Maine v. Taylor*, 477

U.S. 131, 138 (1986) ("It is well established that Congress may authorize the States to

engage in regulation that the Commerce Clause would otherwise forbid.").  But state

regulation of interstate commerce is only permissible when Congress has made its intent

to allow such regulation "unmistakably clear."  *Id.* at 139 (quoting *South-Central Timber*

*Dev., Inc. v. Wunnicke*, 467 U.S. 82, 91 (1984)).

The district court concluded "the 1980 Act, as amended by the 1985 Act, is the

source of authority for states to enter into interstate compacts pursuant to the Compacts

Clause." *EnergySolutions*, 2009 WL 1392836  at *11.  Examining these two statutes, the

district court was unable to find "unambiguous intent by Congress to grant the nearly

unlimited exclusionary authority" claimed by the Northwest Compact.  *Id.* at *14.  "We

review de novo both the district court's statutory interpretation, and its grant of summary

judgment."  *Elephant Butte Irrigation Dist. v. U.S. Dep't of Interior*, 538 F.3d 1299, 1301

(10th Cir. 2008) (internal citations omitted).

   *A.  Interpretation of an Interstate Compact Begins with the Compact Itself*

The district court erred in looking only to the 1980 and 1985 Acts to determine

congressional authorization for the burdening of interstate commerce.  Instead, the proper

place to begin this analysis is in the Compact itself.

Congressional approval of the Northwest Compact, through the Consent Act, transformed it from mere agreement into federal law. "[W]here Congress has authorized the States to enter into a cooperative agreement, and where the subject matter of that agreement is an appropriate subject for congressional legislation, the consent of Congress transforms the States' agreement into federal law under the Compact Clause." *Cuyler v. Adams*, 449 U.S. 433, 440 (1981). Therefore, we treat the Northwest Compact like any other federal statute, and interpret it accordingly. And we must also bear in mind that "a compact when approved by Congress becomes a law of the United States, but a Compact is, after all, a contract. It remains a legal document that must be construed and applied in accordance with its terms." *Texas v. New Mexico*, 482 U.S. 124, 128 (1987) (internal citations and quotation marks omitted).

In applying these principles, the district court ran afoul in several ways. First, it erred in concluding the 1980 Act has any ongoing application to the grant of congressional authority under the regional compacts. Unlike the 1985 Act, the 1980 Act did contain an express grant of permission for states to exclude out-of-region waste.[8] But

---

[8] *Compare* Pub. L. No. 96-573, § 4. ("After January 1, 1986, any such compact *may restrict the use* of the regional disposal facilities under the compact to the disposal of low-level radioactive waste generated within the region.") (emphasis added) *with* Pub. L. No. 99-240, § 4 ("*Any authority in a compact to restrict the use* of the regional disposal facilities under the compact to the disposal of low-level radioactive waste generated within the compact region shall not take effect before" certain qualifications are met) (emphasis added). The former is an explicit grant of exclusionary authority, while the latter is a qualification on authority granted by a compact.

-17-

the 1985 Act replaced the 1980 Act entirely.[9]  The 1980 Act consists of only four sections, and the 1985 Act begins by stating it is amending the 1980 Act "by striking out sections 1, 2, 3, and 4 [of the 1980 Act] and inserting in lieu thereof" the text of the 1985 Act.  1985 Act § 102.  Since the 1985 Act has completely replaced it, the 1980 Act is no longer in effect, and the district court's legal analysis began in the wrong place when it centered on the earlier, now abrogated, legislation.  "The starting point in discerning congressional intent is the existing statutory text, and not the predecessor statutes." *Lamie v. U.S. Trustee*, 540 U.S. 526, 534 (2004) (internal citation omitted).

Second, the district court assumed the Consent Act could only grant authority already contained in the 1980 and 1985 Acts—that is, that the individual agreements consented to by Congress could not grant any additional authority.  EnergySolutions urges us to adopt this interpretation.  But an "enabling statute," such as the 1980 or 1985 Act is not necessary for states to form an interstate compact.  "Congress may consent to an interstate compact by authorizing joint state action in advance [i.e., in an enabling statute,] or by giving expressed or implied approval to an agreement the States have already joined." *Cuyler*, 449 U.S. at 441.  If no enabling statute is necessary, then a congressionally approved compact need not find a statutory basis for its powers elsewhere.  Thus, the district court should have credited the language of the Compact in the first instance, rather than resorting to the 1980 Act and the 1985 Act.

---

[9]  Even EnergySolutions admits in its brief that the 1980 Act is no longer in effect.  Aple. Br. at 10, n.3.

Congress extended broad authority to member states by consenting to the Northwest Compact. By statutory grant, Congress expressly found the Compact "is in furtherance of the Low-Level Radioactive Waste Policy Act [the 1985 Act]," ratifying the understanding that the various statutes work in harmony. 42 U.S.C. § 2021d. In further confirmation of this understanding, the "consent of Congress is hereby given ... to each and every part and article [of the Compact]." *Id.* The Compact then goes on to provide exclusionary authority to the Northwest Committee over "any site, location, stricture, or property used or to be used for the storage, treatment, or disposal of low-level waste." *Id.*

This interpretation is reinforced by a recent Supreme Court case reviewing a regional LLRW compact. *Alabama v. North Carolina*, 130 S. Ct. 2295 (2010).[10] In this case, the Court was faced with the task of interpreting the Southeast Compact, an LLRW compact approved at the same time as the Northwest Compact. Avoiding any linkage to the 1985 Act, the Court based its holding on the language of the compact itself and Congress's power to consent under the Compact Clause, art. I, § 10, cl. 3. Although the precise issue in our case was not raised before the Court, the holding supports our conclusion that consent to create these authorities arises from the Consent Act, not the 1985 Act. Turning to the Southeast Commission's regulatory authority, the Court underscored that "[t]he terms of the Compact determine that question." *Id.* at 2305. Similarly in this case "[t]he terms of the Compact" control—not the terms of the 1985

---

[10] This illuminating opinion was unfortunately unavailable to the district court, as it was not published until after oral arguments on appeal.

Act. In fact, the Court does not cite to the 1985 Act at all. Instead, the Court treats the compact much as it would any other contract, even going so far as to rely on traditional canons of construction to interpret its meaning. *See id.* at 2308–12 (citing, among other sources, RESTATEMENT (SECOND) OF CONTRACTS).

Instead of comparing the Southeast Compact with the 1985 Act, the Court compares its terms "with those of other interstate compacts, approved by Congress contemporaneously." *Id.* at 2307 (citing *Texas v. New Mexico*, 482 U.S. at 565) (internal punctuation omitted). Ultimately, the Court declined to read an implied remedial power into the compact that lacked one, when Congress had explicitly approved such a power in contemporaneous compacts. *Id.* Although not exactly analogous to the question here, we share the Court's "reluctan[ce] to read absent terms into an interstate compact given the federalism and separation-of-powers concerns that would arise were we to rewrite an agreement among sovereign States, to which the political branches consented." *Id.* at 2312–13. EnergySolutions' preferred interpretation effectively eliminates through misdirection the exclusionary authority of the Compact over the Clive Facility.

Finally, the district court and EnergySolutions rely on the general provisions of the 1985 Act to conclude the Northwest Compact does not have exclusionary authority over the Clive Facility. As we discuss in more detail below, these provisions are ambiguous at best. For instance, EnergySolutions argues the 1985 Act is the only source of exclusionary authority but glosses over the fact the 1985 Act rejected the language in the 1980 Act that was an explicit grant of authority, and replaced it with language that merely

-20-

placed conditions on the grants of authority found in a compact. *See* footnote 9, *supra*. Yet EnergySolutions insists this conditional language supercedes direct language to the contrary contained in the Compact.

On that same point, EnergySolutions argues § 2021e(f)(1)(B) of the 1985 Act, which grants exclusionary authority over "any non-Federal low-level radioactive waste disposal facilities within [the] borders" of a compact during the transition period, is evidence Congress intended to grant this authority only during that time. With the expiration of the transition period, the Northwest Compact would no longer have any authority over the Clive Facility. We disagree with this interpretation. While some compacts may have had narrower grants of exclusionary authority in their compacts than the Northwest Compact, Congress could have determined it important to give them broader statutory authority during the transition period. This provision does not suggest in any way that Congress affirmatively withdrew its consent to the exercise of exclusionary authority over these types of facilities after the transition period ended. In fact, through the Consent Act Congress explicitly consented to "each and every part and article" of the Northwest Compact, including its exclusionary authority. We cannot construe vague provisions in the 1985 Act to supplant the clear specific mandate of the Compact.

In sum, the district court erred in relying on the 1980 Act, and the general provisions of the 1985 Act do not prevent the Compact from exercising exclusionary authority. In the Consent Act, Congress affirmatively waived any dormant Commerce

Clause objections that otherwise would have prevented the party states from complying with the terms of the Northwest Compact.[11]

B. *The Northwest Compact Grants Exclusionary Authority over the Clive Facility*

We now turn to whether the Northwest Compact grants exclusionary authority over the Clive Facility. We focus on the text of the Northwest Compact to determine the scope of its authority. "Statutory construction must begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose." *Gross v. FBL Fin. Servs., Inc.*, 129 S. Ct. 2343, 2350 (2009).

The Northwest Compact defines a "facility" as "*any* site, location, structure, or property used or to be used for the storage, treatment, or disposal of low-level waste, excluding federal waste facilities." Consent Act § 221, Art. II(1) (emphasis added). The Clive Facility plainly falls within this definition, and EnergySolutions does not claim otherwise.

Since the Clive Facility meets the definition of a covered facility, we next must determine what regulatory authority the Northwest Compact provides. The Compact states that "[n]o facility located in any party state may accept low-level waste generated outside of the region comprised of the party states, except as provided in article V." *Id.* at

---

[11] One other circuit has reached the same conclusion. The Seventh Circuit concluded the LLRW "compacts, after being ratified by Congress to take the dormant Commerce Clause out of the picture, could prohibit outside waste from entering their regions' disposal facilities." *Central Midwest Interstate Low-Level Radioactive Waste Comm'n v. Pena*, 113 F.3d 1468, 1470 (7th Cir. 1997).

Art. IV(2).  By this language, the Clive Facility, a "facility," located in Utah, a "party

state," therefore may not accept any low-level waste generated outside of the Northwest

Compact, unless the Northwest Committee permits it.  The Northwest Committee

specifically voted to deny permission for the waste in question, and EnergySolutions does

not allege the actions of the Committee were not in conformity with Article V of the

Compact.

In short, the Northwest Committee has Compact authority to exclude the

importation of waste from Italy, and any other waste generated outside the Northwest

Compact region.

*C.  The 1985 Act Does Not Limit the Compact*

Given the Northwest Compact's textual grant of exclusionary authority,

EnergySolutions must rely on some other reason that the Northwest Committee's actions

were unlawful.  It advances several arguments, but ultimately none is persuasive.

1.  Saving Clauses

EnergySolutions first points to two "saving clauses" in the implementing statutes

to demonstrate Congress did not actually consent to the broad grant of exclusionary

authority embodied in the Northwest Compact.  One is located in the Consent Act, and

the other in the 1985 Act.

"[A] general rule of statutory construction [is] that the burden of proving

justification or exemption under a special exception to the prohibitions of a statute

generally rests on one who claims its benefits."  *NLRB. v. Ky. River Cmty. Care, Inc.*, 532

U.S. 706, 711 (2001) (quoting *FTC v. Morton Salt Co.*, 334 U.S. 37, 44–45 (1948)).

EnergySolutions contends the saving clauses at issue make the Compact mean something other than its plain reading would suggest, namely, that it does not provide the exclusionary authority granted to the Northwest Compact discussed above. It is EnergySolutions' responsibility to demonstrate the Northwest Compact does not actually have this authority, and it has failed to do so.

### a. Consent Act Saving Clause

As to the first saving clause, Congress consented to the Northwest Compact "subject to the provisions of the [1985] Act," and "only for so long as the regional commission, committee, or board established in the compact complies with all of the provisions of such Act." Consent Act § 212. EnergySolutions argues these conditions indicate Congress only consented to provisions in the Compact that were explicitly approved in the 1985 Act. If true, this would mean that even though the Compact is the primary source of the Northwest Compact's exclusionary authority, that authority is circumscribed by reference to the 1985 Act. We disagree with this interpretation.

As we noted earlier, Congress explicitly consented to "each and every part and article" of the Compact. Consent Act § 221. EnergySolutions would have us essentially rewrite this agreement by concluding Congress took away with one hand what it gave with the other—that is, by conditioning its consent on compliance with the 1985 Act, it was not really granting what it purported to grant. Even if we were to assume Congress may, at times, do just this, we are reluctant to conclude it would do so in such a casual

-24-

way, especially on such an important issue. Congress, according to the Supreme Court, "does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions—it does not, one might say, hide elephants in mouseholes." *Whitman v. Am. Trucking Ass'ns.*, 531 U.S. 457, 468 (2001). And of course, repeals by implication are disfavored. *See Bialek v. Mukasey*, 529 F.3d 1267, 1270 (10th Cir. 2008) (quoting *United States v. Morgan*, 222 U.S. 274, 281 (1911)).

EnergySolutions also posits that when Congress adopted the Compact "subject to the provisions" of the 1985 Act, this meant we must read any reference to "facility" in the Compact as referring to a "regional disposal facility" as defined in the 1985 Act. Under that reading, the Northwest Compact only exercises exclusionary authority over the Clive Facility if that facility is "operated under a compact." 1985 Act § 2021b(11). And the Clive Facility does not meet this definition since it is a private facility not operated by the Northwest Compact. Even assuming for the moment this is a valid representation of Congress's grant of consent, we are not persuaded by this argument. We can find little in the context of the statute or the legislative history to determine the meaning of the phrase "under a compact." The choice of "under" in this context is more inclusive than if Congress had said operated *by* a compact, and may mean nothing more than simply a facility operated *within* a compact. Regardless of its proper meaning, we will not allow the non-specific saving clause to undo Congress's specific language in the Consent Act. When Congress conditions its explicit consent to each part of a compact on conformity

with another federal statute, the most natural understanding of this action is to allow any part of the compact that is not in direct conflict with the federal statute to stand.

In context, this means, for instance, the Northwest Compact is required to comply with the benchmarks established in the 1985 Act, even though the Compact contains no such requirements. It does not mean the compacts are forbidden from agreeing to anything not found in the 1985 Act.[12]

Recent case law supports this natural interpretation. In *Alabama v. North Carolina*, for example, the Supreme Court analyzed a compact containing provisions that required more than the text of the 1985 Act. One of the main disagreements among the parties in that case was whether the Southeast Compact authorized the imposition of monetary sanctions on states failing to conform to their responsibilities. 130 S. Ct. at 2305. But nothing in the 1985 Act authorizes compacts to do so. While the Court eventually determined the Southeast Commission lacked this authority, it was not because the *1985 Act* failed to provide for it, but because the *terms of the compact* did not allow it. *Id.* at 2305–07. Importantly, the Court noted *other* compacts, approved contemporaneously, did allow for the imposition of monetary sanctions. *Id.* at 2307.

---

[12] EnergySolutions points again to language in § 2021e(f)(1)(B) of the 1985 Act in further support of its argument. It argues the transition portion of the Act carved out special treatment for "non-Federal low-level radioactive waste disposal facilities," demonstrating a difference between regional disposal facilities and facilities like Clive. Given the explicit language of the Compact, we are not persuaded Congress intended by implication (upon implication) to take away exclusionary authority by referencing the temporary authority contained in the 1985 Act.

This indicates the Court viewed the entire LLRW interstate compact system as allowing for great flexibility in determining each compact's specific authority, which is defined by each compact's language. *Alabama* thus indicates compacts are not limited only to authority found in the 1985 Act.

Another type of authority found in many compacts but not in the 1985 Act is the authority to require all LLRW generated within a compact's region to be disposed of in the regional disposal facility. A policy prohibiting export from the state or region would also implicate dormant Commerce Clause concerns, *see South-Central Timber Dev., Inc. v. Wunnicke*, 467 U.S. 82, 91 (1984) ("[T]he Court has viewed with particular suspicion state statutes requiring business operations to be performed in the home State that could more efficiently be performed elsewhere.") (internal quotations omitted), and therefore this practice can only continue with express congressional approval. These provisions exist to ensure the regional disposal facility will always have an incoming stream of waste, and therefore make it more likely the facility will remain economically viable.

These provisions are an important feature of the statutory scheme. Amici argue that if compacts only have authority explicitly laid out in the 1985 Act, then no compact would be entitled to require disposal of in-region waste at their regional disposal facilities. In turn, they argue, this would undermine the economic viability of their disposal sites, potentially leading to closures and a nationwide lack of disposal sites. We recognize many congressionally-approved compacts contain this authority to prevent export of LLRW generated in the region. *See* Br. of Amicus Curiae Atlantic Interstate

Low Level Radioactive Waste Compact, *et. al*, pp. 20–21 (citing provisions in the Southeast Compact, the Texas Compact, and the Southwestern Compact); Br. of Aplt. Rocky Mountain Low-Level Radioactive Waste Compact, pp. 19–20 (citing provisions in the Rocky Mountain Compact, the Central Compact, the Central Midwest Compact, and the Atlantic Compact).   These provisions help illustrate the point that many compacts go beyond the 1985 Act itself, a point Congress affirmed by its wholesale approval contained in the Consent Act.

In short, when Congress conditioned its consent on compliance with the 1985 Act, it meant only to strike out any provisions of a compact that directly contradicted that Act. Congress did not intend, when adding the saving clause to its consent, to negate the consent it had explicitly given under specific terms of each compact.

### b. 1985 Act Saving Clause

EnergySolutions points last to the 1985 Act's saving clause as textual support for a limitation on the Compact.  The 1985 Act explicitly limits the effect of any compact on federal law:

> Except as expressly provided in sections 2021b to 2021j of this title, nothing contained in sections 2021b to 2021j of this title or any compact may be construed *to limit the applicability of any Federal law or to diminish or otherwise impair the jurisdiction of any Federal agency*, or to alter, amend, or otherwise affect any Federal law governing the judicial review of any action taken pursuant to any compact.

42 U.S.C. § 2021d(b)(4) (emphasis added).  EnergySolutions highlights the language referring to the applicability of "any Federal law."  According to EnergySolutions, this

means the only limits on federal law as embodied in the dormant Commerce Clause are the limits *expressly* set forth in the 1985 Act. "As the appellants do not (and indeed cannot) dispute, the dormant Commerce Clause is 'Federal law.'" Aple. Br. at 35.

EnergySolutions provides little support for this contention. And the logic of the contention is belied by the statutory scheme and the Compact approved by Congress. Indeed, since the dormant Commerce Clause is no longer a barrier after Congress approves an interstate agreement, EnergySolutions must show Congress purposely adopted this awkward phrasing to indicate it had not really consented to what it explicitly said it had consented to in the Compact.

We doubt Congress intended to limit the Northwest Compact's power to regulate interstate commerce in legislation designed to grant that ability. While the phrase "any Federal law" plainly suggests statutory enactments, rules and regulations, and probably even decisional law, if Congress had wished to limit the compacts' authority over interstate commerce by leaving the Commerce Clause concerns unaffected, it would have chosen more precise language to indicate it had done so. EnergySolutions' interpretation is especially odd given that the dormant Commerce Clause is an implied structural restraint on state power that Congress was intentionally restoring through the grant of exclusionary authority.

Neither the statute nor the legislative history on this point is particularly helpful. Congress certainly knew how to preempt compact language. For example, the provision of the saving clause regarding judicial review, 42 U.S.C. § 2021d(b)(4), was undoubtedly

-29-

included to counteract a different compact's judicial review provision that Congress found objectionable. *See EnergySolutions*, 2009 WL 1392836 at \*12–13 (quoting Senator Leahy's statements regarding judicial review provision in the Northeast Compact). This inclusion demonstrates Congress knew how to address specific provisions to which it did not wish to give its consent. It is certainly probative that Congress made no such attempt to specifically and clearly limit the exclusionary authority of compacts only to regional disposal facilities as defined in the 1985 Act. All we can say for sure is Congress resolved specific problems with specific compacts when it enacted the Consent Act. In the end, it would be incongruous to conclude the compact legislation indirectly and surreptitiously took away important explicit compact authority by incorporating imprecise limiting language from the saving clause to the 1985 Act.

In sum, by approving the Northwest Compact, Congress abrogated the application of the dormant Commerce Clause to the Northwest Compact's authority over waste streams entering the Clive Facility. We therefore conclude the 1985 Act's saving clause does not indirectly limit this express grant of authority.

### 2. Regulatory Overreach

Finally, we address several additional points relied on by the district court and raised on appeal by EnergySolutions. The first is that allowing the Northwest Compact to exclude out-of-region waste from the Clive Facility would give it power to regulate the facility out of business. Such power would discourage investors from developing new disposal sites and thereby undermine congressional objectives behind the 1985

Act—developing sufficient LLRW disposal capacity to meet the nation's needs. The second argument is that since the Clive Facility is the only disposal facility in existence that is *not* operating as a regional disposal facility, a decision that the Northwest Compact has no exclusionary authority over the Clive Facility would not affect the authority of other compacts.

This first argument over-simplifies the purposes that led Congress to enact the 1985 Act, and misapprehends the potential consequences of concluding that compacts are powerless to exclude out-of-region waste (except in the case of regional disposal facilities, as defined by the 1985 Act). Congress had in mind not only the creation of new disposal capacity when it passed the 1985 Act, but also the ability of states to prevent themselves from becoming dumping grounds for the nation's LLRW. Therefore, in interpreting these statutes, we must not focus on one motivation to the complete abandonment of the other.

Next, it is important to remember the state of Utah conditioned the license it granted on the Clive Facility's compliance with the authority of the Northwest Compact. We are not implying reliance trumps a constitutional constraint. If we had concluded the Compact's claimed authority was prohibited by the dormant Commerce Clause, Utah's reliance would be irrelevant absent some other regulatory authority. But Utah's license is instructive—from what the record indicates, it is unlikely Utah would have agreed to issue the necessary licenses if it was powerless to control the flow of waste past its borders. Why would any other state behave differently in the future? Indeed, were the

states to lose exclusionary authority, they would refuse to license facilities in the first place or to re-license them after the fact with necessary limitations. Such an interpretation could actually hasten the closing of the Clive Facility, and enhance the reluctance on the part of other states to permit the construction of new disposal sites.

As to the second argument, it is true the Clive Facility is the only currently operating disposal facility with this unique arrangement. In that sense, no other compacts would be affected by a conclusion that the Northwest Compact lacks exclusionary authority over the Clive Facility. But the only way we could conclude the Northwest Compact lacks this exclusionary authority is to declare the 1985 Act, not the Compact, provides an important limitation on compact authority. This legal conclusion *does* affect all the other compacts, and could greatly undermine the agreements made by other states.

Accordingly, we reject EnergySolutions' arguments that the Northwest Compact lacks the authority to regulate out-of-region waste disposal at the Clive Facility.

### III. CONCLUSION

Like the Supreme Court, we are hesitant to "order relief inconsistent with the express terms of a compact." *Alabama*, 130 S. Ct. at 2313 (quoting *New Jersey v. New York*, 523 U.S. 767, 811 (1998)) (internal punctuation omitted). Concluding the Northwest Compact is statutorily and constitutionally permitted to exercise exclusionary authority over the Clive Facility, we REVERSE and REMAND for proceedings consistent with this opinion.